IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff,

        v.

JACKSON NATIONAL LIFE INSURANCE COMPANY, and
JACKSON NATIONAL LIFE DISTRIBUTORS, LLC,

Defendants.

**COMPLAINT**

**NATURE OF THE ACTION**

This is an action under Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991, to correct unlawful employment practices on the basis of race, color, and sex and to provide appropriate relief to La'Tonya Ford, Kimberly Funchess, Alcena Gannaway, Marietta Silva, and other aggrieved individuals. As alleged with greater particularity below, the Equal Employment Opportunity Commission (the "EEOC" or "Commission") alleges that Jackson National Life Insurance Company ("JNL") and Defendants Jackson National Life Distributors, LLC ("JNLD") engaged in unlawful discrimination by (a) denying promotions, affording less favorable terms and conditions of employment, paying disparate compensation, discharging or constructively discharging employees because of race and/or color, black and African-American, and tolerating a work environment that was hostile because of race and/or color, black and African-American; (b) denying promotions, affording less favorable terms and conditions

1

of employment, paying disparate compensation, and discharging or constructively discharging employees because of their sex, female, and creating and tolerating a sexually hostile work environment; and (c) retaliating against employees who filed charges of discrimination and/or opposed what they reasonably and in good faith believed were unlawful discriminatory employment practices because of sex, race, and/or color.

## JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. This action is authorized and instituted pursuant to Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§ 2000e-5(f)(1) and (3) ("Title VII"), and pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2. The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of Colorado.

## PARTIES

3. Plaintiff EEOC is the agency of the United States of America charged with the administration, interpretation and enforcement of Title VII and is expressly authorized to bring this action by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1).

4. At all relevant times, Defendant JNL, a Michigan corporation, has continuously been doing business in the State of Colorado, and has continuously had at least 15 employees.

5.  At all relevant times, Defendant JNL has continuously been an employer engaged in an industry affecting commerce under Sections 701(b), (g), and (h) of Title VII, 42 U.S.C. § 20003(b), (g) and (h).

6.  At all relevant times, Defendant JNLD, a Delaware corporation, has continuously been doing business in the State of Colorado, and has continuously had at least 15 employees.

7.  At all relevant times, Defendant JNLD has continuously been an employer engaged in an industry affecting commerce under Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

## ADMINISTRATIVE PROCEDURES

8.  More than thirty days prior to the institution of this lawsuit, La'Tonya Ford, Kimberly Funchess, Alcena Gannaway, and Marietta Silva filed charges with the Commission alleging violations of Title VII by Defendants.

9.  The EEOC provided Defendants with notice of the charges of discrimination.

10. On March 11, 17, and 20, 2015, the Commission issued to Defendants Letters of Determination finding reasonable cause to believe that Defendants violated Title VII.

11. The Commission's determinations included an invitation for Defendants to join the Commission in informal methods of conference, conciliation, and persuasion in an attempt to eliminate and remedy the unlawful employment practices.

12. The Commission engaged in communications with Defendants to provide them the opportunity to remedy the discriminatory practices described in the Letters of Determination.

13. On September 30, 2015, the Commission issued to Defendants Notices of Failure of Conciliation advising Defendants that the Commission was unable to secure from Defendants a conciliation agreement acceptable to the Commission.

14. All conditions precedent to the institution of this lawsuit have been fulfilled.

## GENERAL ALLEGATIONS

15. The hierarchy of Defendants' sale representatives responsible for marketing and distributing JNL financial products, from the lowest-paying to highest-paying position is as follows: Internal Wholesalers, Business Development Consultants (BDC), and External Wholesalers.

16. Within the classification of Internal Wholesalers, there is an additional hierarchy: Internal Wholesaler Level I, Internal Wholesaler Level II, and Senior Internal Wholesaler (also known as Level III Internal Wholesaler).

17. Internal Wholesalers and BDCs are supervised by and report to a Desk Director.

18. Desk Directors report to the Senior Vice President of Sales Development.

**La'Tonya Ford**

19. La'Tonya Ford, a black female, was hired by Defendants in February 2006 in Atlanta, Georgia as an Internal Wholesaler.

20. In January 2007, Ford was transferred to JNLD headquarters in Denver, Colorado to work as an Internal Wholesaler in JNLD's Regional Broker Dealer Channel ("RBD Channel").

21. At all relevant times, the Desk Director of the RBD channel in Denver was Cory Walker, a white male.

22. After transferring to Denver, Ford attended a company party at the home of the Divisional Vice President, John Poulsen.

23. At the company party, Poulsen held a bottle of vodka horizontally and told Ford to get on her knees.

24. Ford was humiliated and left the party.

25. On at least one occasion, BDC Alex Crosby asked Ford what size her breasts were.

26. On another occasion, Crosby stated to Ford "that's a nice shirt you have on" followed by "I like a little milk between my chocolate chip cookies."

27. On another occasion, Crosby told Ford, referring to another female employee, that "Casey has some really big ones."

28. On another occasion, Crosby referred to another employee's breast as "double-breasted mattress slappers."

29. After President Obama's election in 2008, Ford overheard Internal Wholesalers saying "Watermelon is going to be on sale" and "Chevy Impalas will be discounted."

30. After President Obama's election in 2008, emails circulated throughout the office using racial slurs in reference to President Obama.

31. In the first quarter of 2008, Ford had the highest sales of all Internal Wholesalers in the RBD Channel.

32. Walker awarded a $1,500 First Place Wholesaler prize to a white male, Jeremiah Batla, who was second in sales behind Ford.

33. In 2008, Ford became a trainer of Internal Wholesalers, and trained a number of Internal Wholesalers.

34. In or around March 2009, Ford was promoted to BDC.

35. When Ford became a BDC, Walker failed to provide Ford with quarterly evaluations, despite providing all of Ford's white co-workers with quarterly evaluations.

36. Quarterly evaluations are used to determine compensation.

37. On or about September 10, 2009, Walker placed Ford on a written Performance Improvement Plan ("PIP").

38. On or about September 11, 2009, Ford wrote a complaint to Human Resources about discrimination and hostile work environment perpetuated by Walker.

39. After Ford submitted her complaint to HR, Walker began to unfairly scrutinize Ford's work performance and time management, and failed to inform her about promotional opportunities.

40. Ford subsequently complained a second time to Human Resources.

41. On or about December 7, 2009, Ford filed a charge of discrimination with the EEOC.

42. In or around late-December 2009, Defendants' HR department conducted an internal investigation into Ford's complaints.

43. As a result of the internal investigation, the PIP Walker had imposed was expunged from Ford's records.

44. As a result of the internal investigation, Ford was reassigned to report directly to Robert Blanchette, Jackson's Vice President of National Sales Development.

45. Blanchette reported to James Bossert, Jackson's Senior Vice President of Sales Development.

46. After Ford was assigned to report to Blanchette, Bossert told Blanchette to find reasons to fire Ford.

47. On at least one occasion, Bossert also referred to people of color as "pieces of shit."

48. After Ford was assigned to Blanchette, Walker frequently complained to Blanchette about Ford.

49. Upon concluding that there was no basis for Walker's complaints, Blanchette refused to discipline Ford.

50. Walker then went over Blanchette's head and complained to Bossert about Ford.

51. Despite urging from Bossert and Walker, Blanchette still refused to discipline Ford because he had no evidence Ford was not performing her job well.

52. At or around the same time, Blanchette believed two white employees, Jacob Milder and Holly Burke, should be disciplined for performance issues.

53. Blanchette raised his concerns about the job performance of Milder and Burke with Bossert.

54. Bossert instructed Blanchette not to take disciplinary action against Milder and Burke.

55. Instead, Bossert suggested that Blanchette discipline Ford.

56. In December 2009, an External Wholesaler position became available.

57. Blanchette stated to Bossert that Ford was well qualified for the External Wholesaler position.

58. Bossert stated words to the effect of "we'll frickin' interview her, but she won't get it."

59. In February 2010, sales bonuses were distributed to sales representatives.

60. Sales bonuses are calculated based on participation, attendance, and the supervisor's discretion.

61. Although Ford was reporting to Blanchette at the time, Walker was responsible for determining Ford's bonus.

62. The range of most bonuses in February 2010 was $4,200 to $5,000.

63. Walker gave Ford a bonus was $3,100.

64. In February 2010, Ford received a "meets expectation" on her annual evaluation.

65. Although signed by Blanchette, Walker and Bossert authored the negative portions of the review.

66. One day after Blanchette gave Ford the "Meets Expectations" annual evaluation, Bossert fired Blanchette.

67. After Blanchette's termination, Bossert instructed Ford to report to him directly.

68. Like Walker, Bossert failed to give Ford quarterly evaluations while she was under Bossert's direct supervision.

69. Bossert gave all other employees he supervised quarterly evaluations.

70. In early 2010, Defendants' Human Resources Director, Gary Stone, stated that he would look for an External Wholesaler position for Ford.

71. Between January and April 2010, Defendants opened at least three External Wholesaler positions to internal candidates.

72. Between January and April 2010, Ford applied for at least three of the External Wholesaler openings.

73. All three External Wholesaler openings between January and April 2010 were filled with white males who were less qualified and experienced than Ford.

74. On May 20, 2010, Ford filed a second charge of discrimination with the EEOC.

75. Between June and August 2010, Ford interviewed for five External Wholesaler openings.

76. Of the five External Wholesaler positions Ford applied for, three were given to white males who were less qualified and experienced than Ford.

77. Between June and August of 2010, Defendants filled at least eight External Wholesaler positions with white male employees who had less qualifications and experience than Ford.

78. On August 31, 2010, immediately after conversing with Ford, BDC Kyle Portual and Internal Wholesaler Alyssa Hultman were called into Walker's office.

79. Walker told Portual and Hultman that their sales-call statistics were suffering because of distractions and that he would be monitoring their calls.

80. The next day, September 1, 2010, BDC Eric Gielow was called into Walker's office after conversing with Ford.

81. Walker told Gielow that his calls were suffering because of distractions and that Walker would be monitoring his calls.

82. In or about October 2010, two of Ford's coworkers marked a football by replacing the printed words "black rock" on the football with "black cock."

83. The coworkers then handed the ball to Ford.

84. Ford complained about this incident, but did not believe any action would be taken.

85. Ford was constructively discharged in October 2010.

**Kimberly Funchess**

86. Kimberly Funchess, a black female, started working for Defendants as an Internal Wholesaler in Atlanta, Georgia, in October 2005.

87. In 2006, Funchess transferred to Denver and was promoted to Senior Internal Wholesaler, reporting to Senior Vice President Brian Lane.

88. In October 2007, Lane promoted Funchess to Desk Director of the Bank Channel.

89. In 2008, Funchess began reporting to Bossert, after Lane was terminated.

90. Bossert made demeaning remarks about Funchess and Ford, calling them "lazy", "prima donnas", and "bitches from Atlanta."

91. Bossert also referred to Funchess and Ford as "our two resident street walkers."

92. When Funchess and Ford asked to speak to the CEO about upcoming External Wholesaler openings, they were told by Executive Vice President Gary Saulsbury that it was unheard of for a black employee to make over $100,000.

93. Bossert excluded Funchess from lunches and meetings in his office with the other white desk directors.

94. In July 2009, Funchess complained to CEO Clifford Jack about race discrimination in the company and failure to promote blacks.

95. After Funchess complained to Jack, Bossert called her into his office and told her he knew she had complained and warned her to be careful.

96. In November 2009, Bossert gave Funchess an unwarranted disciplinary action.

97. In December 2009, Funchess filed a charge of discrimination.

98. In April 2010, Bossert again gave Funchess an unwarranted disciplinary action.

99. On April 14, 2010, Funchess was discharged.

100. In the period from January to April 2010, Defendants filled at least five External Wholesaler positions.

101. All five External Warehouse positions were filled by white males who had less qualifications and experience than Funchess.

**Marietta Silva**

102.  Marietta Silva, an African-American female, began working for Defendants as an Internal Wholesaler in May 2008.

103.  Silva reported to Corey Walker.

104.  By the end of her first year with Defendants, Silva had one of the top-producing territories in the channel.

105.  Silva and Ford were the top sales producers for 2008, and the only two Internal Wholesalers in the East Division of the RBD channel to exceed their goals.

106.  Silva was passed over for promotion to a Level II Internal Wholesaler, in favor of a lower-performing white male.

107.  Silva was passed over for promotion to BDC, in favor of a lower performing white male.

108.  On September 18, 2009, Silva complained to Human Resources that she and Ford were being discriminated against because of their race and sex.

109.  After Silva complained to HR, Walker gave Silva one or more unwarranted disciplinary actions.

110.  In November 2009, Silva was transferred, causing her to lose all her existing client relationships.

111.  In December 2009, Silva filed a charge of discrimination, alleging race and sex discrimination, and retaliation.

112.  In December 2010, Silva was constructively discharged.

113.  During 2010, Defendants filled at least six External Wholesaler positions with white male employees who had less qualifications and experience than Silva.

**Alcena Gannaway**

114.   Alcena "Al" Gannaway, a black male, began working for Defendants as an Internal Wholesaler in January of 2006.

115.    In June 2008, Gannaway was promoted to BDC.

116.   In 2008, Gannaway was passed over for promotion to Desk Director in favor of three less qualified white candidates.

117.   From January to March 2009, Gannaway served as Acting Desk Director, but when the position was filled on a permanent basis, Gannaway was denied the position in favor of a white employee.

118.   In November 2009, Gannaway was discharged for allegedly sending an unapproved email.

119.   The email Gannaway sent was, in fact, approved for distribution.

## FIRST CLAIM FOR RELIEF

**[Discrimination Based on Race and/or Color – U.S.C. §§ 2000e-2(a) & 2000e-5(f)(1)]**

120.   The allegations contained in the foregoing paragraphs are incorporated by reference.

121.   Defendants discriminated against La'Tonya Ford, Kimberly Funchess, Marietta Silva, Alcena Gannaway, and other aggrieved individuals because of race and/or color in violation of section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a), by denying them promotions, affording them less favorable terms and conditions of employment, paying disparate compensation, and discharging or constructively discharging them because of their race and/or color, and by creating and tolerating a work environment that was hostile because of race and/or color.

122. The effect of the practices complained of above has been to deprive Ford, Funchess, Silva, Gannaway, and other aggrieved individuals equal employment opportunities, and otherwise adversely affect their status as employees because of their race and/or color.

123. The unlawful employment practices complained of above were intentional.

124. The unlawful employment practices complained of above were done with malice or reckless indifference to the federally protected rights of Ford, Funchess, Silva, Gannaway, and other black and African-American black employees who were aggrieved by the discriminatory practices.

## SECOND CLAIM FOR RELIEF

### [Discrimination Based on Sex – 42 U.S.C. §§ 2000e-2(a) & 2000e-5(f)(1)]

125. The allegations contained in the foregoing paragraphs are incorporated by reference.

126. Defendants discriminated against La'Tonya Ford, Kimberly Funchess, Marietta Silva, and other aggrieved female employees because of their sex, female, in violation of section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a), by denying them promotions, affording them less favorable terms and conditions of employment, paying disparate compensation, and discharging or constructively discharging them because of their sex, and by creating and tolerating a sexually hostile work environment.

127. The effect of the practices complained of above has been to deprive Ford, Funchess, Silva, and other aggrieved female employees equal employment opportunities, and otherwise adversely affect their status as employees, because of their sex, female.

128. The unlawful employment practices complained of above were intentional.

129. The unlawful employment practices complained of above were done with malice or reckless indifference to the federally protected rights of Ford, Funchess, Silva, and other female employees who were aggrieved by the discriminatory practices.

### THIRD CLAIM FOR RELIEF

[Retaliation – 42 U.S.C. §§ 2000e-3(a)]

130. The allegations contained in the foregoing paragraphs are incorporated by reference.

131. Defendants engaged in unlawful employment practices, in violation of Section 704 of Title VII, 42 U.S.C. § 2000e-3(a), by retaliating against Ford, Funchess, Silva, and other aggrieved individuals, because they filed charges of discrimination and/or opposed what they reasonably and in good faith believed were unlawful discriminatory employment practices because of sex, race and/or color.

132. The effect of the practices complained of above has been to deprive Ford, Funchess, Silva, and other aggrieved individuals of equal employment opportunities, and otherwise adversely affect their status as employees, because they filed charges of discrimination and/or opposed practices made unlawful by Title VII.

133. The unlawful employment practices complained of above were intentional.

134. The unlawful employment practices complained of above were done with malice or reckless indifference to the federally protected rights of Ford, Funchess, Silva, and other employees aggrieved by the unlawful employment practices.

### PRAYER FOR RELIEF

Wherefore, the Commission respectfully requests that this Court:

A. Grant a permanent injunction enjoining Defendants, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with

them, from engaging in unlawful employment discrimination because race, color, sex, and retaliation.

B. Order Defendants to institute and carry out policies, practices, and programs which provide equal employment opportunities for female, black and African-American employees and applicants, and which eradicate the effects of their past and present unlawful employment practices.

C. Order Defendants to make whole La'Tonya Ford, Kimberly Funchess, Marietta Silva, Alcena Gannaway, and other aggrieved individuals, by providing appropriate backpay with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of their unlawful employment practices, including but not limited to reinstatement with an appropriate promotion, or front pay in lieu thereof.

G. Order Defendants to make whole La'Tonya Ford, Kimberly Funchess, Marietta Silva, Alcena Gannaway, and other aggrieved individuals by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described in above, in amounts to be determined at trial.

H. Order Defendants to make whole La'Tonya Ford, Kimberly Funchess, Marietta Silva, Alcena Gannaway, and other aggrieved individuals by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices complained of above, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in amounts to be determined at trial.

I. Order Defendants to pay La'Tonya Ford, Kimberly Funchess, Marietta Silva, Alcena Gannaway, and other aggrieved individuals punitive damages for their

discriminatory conduct described above, that was malicious or done with reckless indifference for the employees' federally protected rights, in amounts to be determined at trial.

    J.    Grant such further relief as the Court deems necessary and proper in the public interest.

    K.    Award the Commission its costs of this action.

P. David Lopez
General Counsel

Gwendolyn Reams
Associate General Counsel

Mary Jo O'Neill
Regional Attorney
Phoenix District Office

Rita Byrnes Kittle
Supervisory Trial Attorney

*s/ Mike Imdieke*
Michael Imdieke
Trial Attorney
  EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Denver Field Office
303 E 17th Avenue, Suite 410
Denver, CO 80203
Phone: (303)-866-1320
Email: michael.imdieke@eeoc.gov