IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-2472-PAB-CBS

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff,

v.

JACKSON NATIONAL LIFE INSURANCE COMPANY,
JACKSON NATIONAL LIFE DISTRIBUTORS, LLC, and
JACKSON NATIONAL LIFE INSURANCE COMPANY OF NEW YORK,

Defendants.

---

## SECOND AMENDED COMPLAINT

---

### NATURE OF THE ACTION

This is an action under Title VII of the Civil Rights Act of 1964 and Title I of the

Civil Rights Act of 1991, to correct unlawful employment practices on the basis of race,

sex and national origin, to provide appropriate relief to Marcus Adams, Kenneth Conley,

La'Tonya Ford, Kimberly Funchess, Alcena Gannaway, the Estate of Kontar Mwamba,

Marietta Vargas (formerly Marietta Silva), George Thomas Minas Hill, Robert

Blanchette, and other aggrieved individuals.  As alleged with greater particularity below,

the Equal Employment Opportunity Commission (the "EEOC" or "Commission") alleges

that Defendants Jackson National Life Insurance Company ("JNL"), Jackson National

Life Distributors, LLC ("JNLD"), and Jackson National Life Insurance Company of New

York ("JNL – New York") (collectively referred to as "Jackson" or "Defendants") engaged

in unlawful discrimination by (a) denying promotions, affording less favorable terms and

conditions of employment, paying disparate compensation, discharging or constructively discharging employees because of race, Black and/or African-American, and tolerating a work environment that was hostile because of race, Black and/or African-American; (b) denying promotions, affording less favorable terms and conditions of employment, paying disparate compensation, and discharging or constructively discharging employees because of their sex, female, and creating and tolerating a sexually hostile work environment; (c) denying promotions, affording less favorable terms and conditions of employment, paying disparate compensation, discharging or constructively discharging employees because of national origin, African, including, but not limited to, African countries such as Ethiopia and the Republic of Cabo Verde, and tolerating a work environment that was hostile because of national origin against Africans, including, but not limited to, African countries such as Ethiopia and Cabo Verde; and (d) retaliating against employees who filed charges of discrimination and/or opposed what they reasonably and in good faith believed were unlawful discriminatory employment practices because of sex, race, and/or national origin.

## JURISDICTION AND VENUE

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345.  This action is authorized and instituted pursuant to Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§ 2000e-5(f)(1) and (3) ("Title VII"), and pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2.      The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of Colorado.

## PARTIES

3.     Plaintiff EEOC is the agency of the United States of America charged with the administration, interpretation and enforcement of Title VII and is expressly authorized to bring this action by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1).

4.     At all relevant times, Defendant JNL, a Michigan corporation, has been continuously in the State of Colorado and has a registered agent in Colorado.

5.     At all relevant times, Defendant JNLD, a Delaware corporation, has continuously been doing business in the State of Colorado, has its principal office in Colorado, and has a registered agent in Colorado.

6.     Between at least 2008 and 2010, Defendant JNL – New York, a New York corporation, continuously employed individuals in the state of Colorado.

7.     At all relevant times, Defendants JNL, JNLD, and JNL – New York have been a joint employer and/or an integrated enterprise operating a financial company offering and distributing financial products, including life insurance and annuities, at 7601 Technology Way, Denver, CO 80237.

8.     At all relevant times, as a joint employer and/or integrated enterprise, Defendants have employed at least fifteen employees.

9.     At all relevant times, as a joint employer and/or integrated enterprise, Defendants have continuously been an employer engaged in an industry affecting commerce under Sections 701(b), (g), and (h) of Title VII, 42 U.S.C. § 20003(b), (g) and (h).

## ADMINISTRATIVE PROCEDURES

10.     More than thirty days prior to the institution of this lawsuit, Marcus Adams, Kenneth Conley, La'Tonya Ford, Kimberly Funchess, Alcena Gannaway, Kontar Mwamba, and Marietta Vargas filed charges with the Commission alleging violations of Title VII by Defendants.

11.     The EEOC provided Defendants with notice of the charges of discrimination.

12.     On March 11, 17, and 20, 2015, the Commission issued to Defendants Letters of Determination finding reasonable cause to believe that Defendants violated Title VII.

13.     The Commission's determinations included an invitation for Defendants to join the Commission in informal methods of conference, conciliation, and persuasion in an attempt to eliminate and remedy the unlawful employment practices.

14.     The Commission engaged in discussions with Defendants to provide them the opportunity to remedy the discriminatory practices described in the Letters of Determination.

15.     On September 30, 2015, the Commission issued to Defendants Notices of Failure of Conciliation advising Defendants that the Commission was unable to secure from Defendants a conciliation agreement acceptable to the Commission.

16.     All conditions precedent to the institution of this lawsuit have been fulfilled.

## GENERAL ALLEGATIONS

17.     The hierarchy of Defendants' sales representatives responsible for marketing and distributing JNL financial products, from the lowest-paying to highest-

paying position is as follows: Internal Wholesalers, Business Development Consultants (BDC), and External Wholesalers.

18.     Within the classification of Internal Wholesalers, there is an additional hierarchy: Internal Wholesaler Level I, Internal Wholesaler Level II, and Senior Internal Wholesaler (also known as Level III Internal Wholesaler).

19.     Internal Wholesalers and BDCs report to a Desk Director.

20.     Desk Directors, in turn, report to the Senior Vice President of Sales Development.

21.     To aid in advancing from an Internal Wholesaler Level I to an Internal Wholesaler Level II, an employee may complete a training called "The Academy."

22.     To aid in advancing from within Internal Wholesaler Levels as well as to be considered for promotion to External Wholesaler, an employee may complete "Boot Camp," and other programs which consist of several training, presentation and performance exercises and a Boot Camp test.

23.     Desk Directors are responsible for promptly reviewing Boot Camp results with their employees.

24.     If an employee does not successfully pass any portion of Boot Camp, the employee's Desk Director is expected to help the employee learn that portion and then allow the employee to retake the Boot Camp test.

**La'Tonya Ford**

25.     La'Tonya Ford, a Black female, was hired by Defendants in February 2006 in Atlanta, Georgia as an Internal Wholesaler.

26.     In January 2007, Ford was transferred to JNLD headquarters in Denver, Colorado to work as an Internal Wholesaler in JNLD's Regional Broker Dealer Channel ("RBD Channel").

27.     Ford received paychecks and W2 wage statements from JNL – New York.

28.     At all relevant times, the Desk Director of the RBD channel in Denver was Corey Walker, a White male.

29.     After transferring to Denver, Ford attended a company party at the home of a Divisional Vice President, John Poulsen.

30.     At the company party, Poulsen held a bottle of vodka horizontally and told Ford to get on her knees.

31.     Ford was humiliated and left the party.

32.     On at least one occasion, BDC Alex Crosby asked Ford what size her breasts were.

33.     On another occasion, Crosby stated to Ford "that's a nice shirt you have on" followed by "I like a little milk between my chocolate chip cookies."

34.     On another occasion, Crosby told Ford, referring to another female employee, that "Casey has some really big ones."

35.     On another occasion, Crosby referred to another employee's breasts as "double-breasted mattress slappers."

36.     After President Obama's election in 2008, racially charged incidents began to occur in the workplace. Ford overheard Internal Wholesalers saying "Watermelon is going to be on sale" and "Chevy Impalas will be discounted."

37.     Additionally, emails circulated throughout the office using racial slurs in reference to then President-elect Obama.

38.     Upon information and belief, Taylor Gorjiyan, a White female internal wholesaler, used the word "nigger" on the JNLD sales floor.

39.     Although Gorjiyan was disciplined for using this slur, she was awarded Internal Wholesaler of the Quarter shortly thereafter, and was ultimately promoted to External Wholesaler.

40.     In the first quarter of 2008, Ford had the highest sales of all Internal Wholesalers in the RBD Channel.

41.     In 2008, Ford became a mentor of Internal Wholesalers, and mentored a number of Internal Wholesalers.

42.     In or around March 2009, Ford was promoted to BDC.

43.     After Ford became a BDC, Walker failed to provide Ford with quarterly evaluations, despite providing all of Ford's White co-workers with quarterly evaluations.

44.     Quarterly evaluations are used to determine compensation.

45.     On or about September 10, 2009, Walker placed Ford on a written Performance Improvement Plan ("PIP").

46.     On or about September 11, 2009, Ford wrote a complaint to Human Resources about discrimination and hostile work environment perpetuated by Walker.

47.     After Ford submitted her complaint to HR, Walker began to unfairly scrutinize Ford's work performance and time management, and failed to inform her about promotional opportunities.

48.     Ford subsequently complained a second time to Human Resources.

49.     On or about December 7, 2009, Ford filed a charge of discrimination with the EEOC.

50.     In or around late-December 2009, Defendants' HR department conducted an internal investigation into Ford's complaints.

51.     As a result of the internal investigation, the PIP Walker had imposed was expunged from Ford's records.

52.     As a result of the internal investigation, Ford was reassigned from Walker and instructed to report directly to Robert Blanchette, Jackson's Vice President of National Sales Development.

53.     Blanchette reported to James Bossert, Jackson's Senior Vice President of Sales Development.

54.     After Ford was assigned to report to Blanchette, Bossert told Blanchette to find reasons to fire Ford.

55.     On at least one occasion, Bossert also referred to people of color as "pieces of shit."

56.     After Ford was assigned to Blanchette, Walker frequently complained to Blanchette about Ford, seeking to have her disciplined.

57.     Upon concluding that there was no basis for Walker's complaints, Blanchette refused to discipline Ford.

58.     Walker then went over Blanchette's head and complained to Bossert about Ford.

59.     Despite urging from Bossert and Walker, Blanchette still refused to discipline Ford because he saw no evidence that Ford was not performing her job well.

60.     At or around the same time, Blanchette believed two White employees, Jake Milder and Holly Burke, should be disciplined for performance issues.

61.     Blanchette raised his concerns about the job performance of Milder and Burke with Bossert.

62.     Bossert instructed Blanchette not to take disciplinary action against Milder and Burke and instead suggested that Blanchette discipline Ford.

63.     In December 2009, an External Wholesaler position became available.

64.     Blanchette stated to Bossert that Ford was well qualified for the External Wholesaler position.

65.     Bossert stated words to the effect of "we'll frickin' interview her, but she won't get it."

66.     Ford was not interviewed for the External Wholesaler position purportedly because she had been placed on a PIP, which was expunged in December 2009.

67.     In February 2010, sales bonuses were distributed to sales representatives.

68.     Sales bonuses are calculated based on participation, attendance, and the supervisor's discretion.

69.     Although Ford was reporting to Blanchette at the time, Walker was responsible for determining Ford's bonus because he had been her supervisor through December 2009.

70.     Walker gave Ford a bonus significantly lower than White BDCs.

71.     In February 2010, Ford also received a "meets expectation" on her annual evaluation.

72.     Although the evaluation was signed by Blanchette,  Walker and Bossert authored the negative portions of the review.

73.     One day after Blanchette issued Ford the "Meets Expectations" annual evaluation, Bossert fired Blanchette.

74.     After Blanchette's termination, Bossert instructed Ford to report to him directly.

75.     Like Walker, Bossert failed to give Ford quarterly evaluations while she was under his direct supervision.

76.     In contrast, Bossert gave all of the White employees he supervised quarterly evaluations.

77.     In early 2010, Defendants' Human Resources Director, Gary Stone, stated that he would look for an External Wholesaler position for Ford.

78.     Between January and April 2010, Defendants opened External Wholesaler positions to internal candidates.

79.     Between January and April 2010, Ford applied for at least three of the External Wholesaler openings.

80.     All three External Wholesaler openings between January and April 2010 were filled with White males who were less qualified and less experienced than Ford.

81.     On May 20, 2010, Ford filed a second charge of discrimination with the EEOC.

82.     Between June and August 2010, Ford interviewed for five External Wholesaler openings.

83.     Of the five External Wholesaler positions Ford applied for, at least three were given to White males who were less qualified and less experienced than Ford.

84.      Between June and August of 2010, Defendants filled at least eight External Wholesaler positions with White male employees who had less qualifications and experience than Ford.

85.     Ford continued to be subjected to incidents of harassment and retaliation. For example, on August 31, 2010, immediately after conversing with Ford, BDC Kyle Portugal and Internal Wholesaler Alyssa Hultman were called into Walker's office.

86.     Walker told Portugal and Hultman that their sales-call statistics were suffering because of distractions and that he would be monitoring their calls.

87.     The following day, September 1, 2010, BDC Eric Gielow was called into Walker's office after conversing with Ford.

88.     Walker told Gielow that his calls were suffering because of distractions and that Walker would be monitoring his calls.

89.     In or about October 2010, two of Ford's coworkers marked a football by replacing the printed words "Black Rock" on the football with "Black Cock."

90.     The coworkers then handed the ball to Ford.

91.     Ford complained about this incident, but did not believe any action would be taken.

92.     Ford was constructively discharged in October 2010.

**Kimberly Funchess**

93.     Kimberly Funchess, a Black female, started working for Defendants as an Internal Wholesaler in Atlanta, Georgia, in October 2005.

94.     In 2006, Funchess transferred to Denver and was promoted to Team Lead, reporting to Senior Vice President Brian Lane.

95.     In October 2007, Lane promoted Funchess to Desk Director of the Bank Channel.

96.     In 2008, following Lane's separation from Defendants, Funchess began reporting to Bossert.

97.     Bossert made demeaning remarks about Funchess and Ford, calling them "lazy", "prima donnas", and "bitches from Atlanta."

98.     Bossert also referred to Funchess and Ford as "our two resident street walkers."

99.     When Funchess and Ford asked to speak to the CEO about upcoming External Wholesaler openings, they were told by Executive Vice President Gregory Salsbury that it was unheard of for Black employees to make over $100,000.

100.     Bossert excluded Funchess from lunches and meetings in his office with other desk directors who were White.

101.     In July 2009, Funchess complained to CEO Clifford Jack about race discrimination in the company and failure to promote Blacks.

102.     After Funchess complained to Jack, Bossert called her into his office and told her he knew she had complained and warned her to be careful.

103.     In November 2009, Bossert gave Funchess an unwarranted disciplinary action.

104.     In December 2009, Funchess filed a charge of discrimination.

105.    In April 2010, Bossert again gave Funchess an unwarranted disciplinary action.

106.    On April 14, 2010, Funchess was fired.

107.    In the period from January to April 2010, Defendants filled at least five External Wholesaler positions.

108.    All five External Warehouse positions were filled by White males who had less qualifications and experience than Funchess.

**Marietta Vargas**

109.    Marietta Vargas, an African-American female of African, Cabo Verdean, national origin, was hired by Defendants as an Internal Wholesaler in May 2008.

110.    Vargas reported to Corey Walker.

111.    By the end of her first year with Defendants, Vargas had one of the top-producing territories in the channel.

112.    Vargas and Ford were the top sales producers for 2008, and the only two Internal Wholesalers in the East Division of the RBD channel to exceed their goals.

113.    Despite successfully completing The Academy in 2009, Walker waited for months to promote Vargas to Level II Internal Wholesaler despite promoting a White male employee to Internal Wholesaler II immediately after he successfully completed The Academy.

114.    In August 2009, Vargas sought to apply for a BDC position in the RBC Channel.

115.    Vargas was told that only Level III Internal Wholesalers with two years of financial sales experience could apply for the position.

116.    This representation proved to be false when a White male with less experience than Vargas was selected for the BDC position in the RBC Channel.

117.    On September 18, 2009, Vargas complained to Human Resources that she and Ford were being discriminated against because of their race and sex.

118.    Two months later, in November 2009, Vargas was involuntarily transferred to the Bank Channel, causing her to lose her territory and all her existing client relationships.

119.    In December 2009, Vargas filed a charge of discrimination, alleging race, national origin, and sex discrimination, and retaliation.

120.    With the transfer to the Bank Channel, Funchess became Vargas's supervisor until she was fired in April 2010.

121.    Funchess was replaced as Vargas' supervisor by Elizabeth Griffith, a White female.

122.    Griffith was supervised by Senior Vice President of Sales, James Bossert.

123.    Bossert, Griffith and other supervisors, including Corey Walker, refused to acknowledge Vargas and actively ignored Vargas whenever she approached them.

124.    Bossert and Griffith refused to respond to Vargas's emails, or responded in a delayed fashion, making it impossible for Vargas to successfully perform her job.

125.    In May 2010, Vargas was constructively discharged.

**Kontar "Tonee" Mwamba**

126.    Kontar "Tonee" Mwamba, a Black male, was hired by Defendants as a BDC for Jackson in October 2008.

127.    Mwamba initially reported to Assistant Vice President Carl Donahue, who also hired Conley.

128.    In January 2009, at a national sales meeting in Denver, Mwamba observed a White External Wholesaler bragging about how he was able to make a Black male Internal Wholesaler do his bidding and shouted words to the effect of "this big Black guy works for me."

129.    When Mwamba protested this conduct by asking why the External Wholesaler was permitted to act in this manner, he was told that the External Wholesaler was an "MMA fighter so the company let him do what he wanted."

130.    Mwamba complained several times to management that he was being harassed at work and his work disrupted, by White employees throwing tennis ball-sized foam stress balls at him. Based on Mwamba's complaints, Donahue and Vice President of Sales Justin Rafferty ordered that the ball-throwing stop.

131.    The ball-throwing nevertheless resumed shortly thereafter and Mwamba again complained to Donahue.

132.    After learning of Mwamba's complaints, Senior Vice President Bossert sent an email to all employees overturning Donahue and Rafferty's directive that the ball throwing stop.

133.    Bossert's email further stated that Mwamba was an "outsider who does not understand the nature of the job."

134.    Based on Bossert's email calling Mwamba an "outsider," employees began specifically targeting Mwamba by throwing balls at him.

135.    The ball throwing was not stopped until a White female Desk Director, Holly Burke, complained in or around March 2010.

136.    In July 2009, Donahue left and Mwamba began reporting to Desk Directors Jake Milder and James Horvath.

137.    In August 2009, "talk time" was added as a metric to the performance evaluation criteria for BDCs.

138.    Each BDC was required to complete at least three hours of "talk time" each day.

139.    In September 2009, Defendants created a new BDC position to deal exclusively with Merrill Lynch in JNLD's RBD Channel.

140.    Mwamba had worked for Merrill Lynch immediately prior to being hired by Defendants and maintained a number of relationships with individuals at Merrill Lynch.

141.    Based in part on Mwamba's contacts at Merrill Lynch, the Merrill Lynch BDC position had greater earning potential than the BDC position Mwamba held at the time, so he applied for the position.

142.    Mwamba was initially scheduled to be interviewed for the Merrill Lynch BDC position, but Desk Director Jake Milder cancelled Mwamba's interview.

143.    Only White employees were interviewed for the Merrill Lynch BDC position.

144.    A White male employee less qualified than Mwamba was selected for the Merrill Lynch BDC position.

145.    In September 2009, after learning that he was not allowed to interview for the Merrill Lynch BDC position, Mwamba complained to Jennifer Amsberry in HR about not being interviewed and that White employees were being treated more favorably.

146.    On September 28, 2009, Mwamba was placed on a PIP.

147.    The PIP required that Mwamba have three hours of talk time, at least 35 "touches" with advisors' offices, and two WebEx presentations per day.

148.    Mwamba complained to Amsberry about being placed on the PIP.

149.    On December 7, 2009, the same day Ford filed her first EEOC charge, Mwamba was removed from the PIP without explanation.

150.    During his employment, Mwamba was subjected to a racially hostile work environment. In addition to the above harassing incidents, a racially demeaning cartoon of Barack Obama was posted around the office.

151.    The cartoon remained posted for several weeks and was observed by Mwamba, Kenneth Conley, and Al Gannaway.

152.    Senior Vice President of Sales Bossert regularly walked by these cartoons but did not have them removed.

153.    In or around January 2010, Mwamba received a negative performance evaluation for the year 2009 that disregarded his satisfactory performance for the first six months of the year when Donahue was his supervisor.

154.    On January 26, 2010, after receiving the negative evaluation, Mwamba filed a charge of discrimination with the EEOC.

155.    Between January 2010 and April 2012, Mwamba continued to be ignored by his supervisors, was expected to perform at a higher level than his White colleagues, and repeatedly had his sales goals changed without warning.

156.    Mwamba was constructively discharged in April 2012.

**Kenneth Conley**

157.    Kenneth Conley, a Black male, was hired by Defendants as a BDC in March 2008.

158.    Conley initially reported to Assistant Vice President Donahue, who hired Conley.

159.    In 2008, Donahue rated Conley as "Meets Expectations."

160.    During his employment, Conley was subjected to a racially hostile work environment. For example, after President Obama was elected, Conley's co-workers told him that, as an African-American, he should be careful not to celebrate President Obama's victory.

161.     In July 2009, Donahue left and Conley began reporting to Desk Directors Jake Milder and James Horvath.

162.    Milder and Horvath treated the White employees they supervised more favorably than Conley and Mwamba.

163.    In January 2010, Conley's evaluation had been objectively scored by the computerized evaluation system as a "Meets Expectations."

164.    Horvath then overrode the objective evaluation and reduced the rating to "Does Not Meet Expectations."

165.   The reduction of his performance evaluation rating in 2010 was despite the fact that Conley's territories had exceeded their goals by an average of 38 percent, higher than the 36 percent average of all other territories.

166.   Because of Horvath's manipulation of Conley's evaluation score, Conley did not receive a salary increase.

167.   In 2009, Conley was third out of 30 BDCs for the number of new financial advisors he was able to recruit and sell Jackson products.

168.   In March 2010, Conley won a prospecting contest for the number of appointments he set with potential clients and earned a trip to a national sales meeting in Myrtle Beach, South Carolina.

169.   At the national sales meeting, Conley was asked to demonstrate his prospecting techniques to External Wholesalers to show them how their BDCs could increase the number of meetings they scheduled.

170.   During Conley's 2010 mid-year review, Milder and Horvath told Conley that his performance was unsatisfactory because he had failed to arrange enough meetings for his External Wholesaler.

171.   When Conley reminded Milder and Horvath that he recently won a prospecting contest, Milder and/or Horvath devalued this achievement and responded to the effect of "No one really tried to win the contest."

172.   In March 2010, Conley filed a charge of discrimination, alleging race and national origin discrimination.

173.   After filing his charge of discrimination, multiple BDC positions became available with National Planning Holdings, Inc. (NPH), a subsidiary of Defendant JNL.

174.    Although posted on a global job board, employees had to have permission from their supervisors to apply for the NPH BDC positions.

175.    Milder and Horvath initially refused to allow Conley to apply for the NPH BDC positions because he allegedly was not meeting his metrics.

176.    Milder and Horvath subsequently changed their position without any explanation and allowed Conley to apply for the NPH BDC positions.

177.    Although Conley was granted an interview for the NPH BDC positions, he was not advised of the interview until the morning of the interview.

178.    In light of the late notice of the interview, Conley had no opportunity to prepare for the interview.

179.    After the interview, Conley was rejected for the NPH BDC openings, allegedly because he had not passed a FINRA Series 7 exam.

180.    However, many of the NPH BDC positions were filled by employees who had not passed the FINRA Series 7 exam.

181.    In September 2010, Horvath gave Conley an unwarranted disciplinary action.

182.    In October 2010, Horvath again gave Conley an unwarranted disciplinary action.

183.    Throughout his tenure, Conley continued to meet sales goals.

184.    On October 25, 2010, Conley was discharged, based allegedly on the earlier unwarranted discipline and an unapproved schedule change on October 24, 2010.

**Marcus Adams**

185.    Marcus Adams, a Black male, was hired by Defendants as an Internal Wholesaler in JNLD's Regional Broker Deal Channel ("RBD Channel") in February 2007.

186.    At the time, Adams was the only Black employee in the RBD Channel.

187.    Adams reported to Desk Director Greg Sodja.

188.    During Adams' first year of employment with Defendants, Sodja and Desk Director Corey Walker spoke with Adams only when necessary for the job.

189.    During at least Adams' first year of employment with Defendants, Senior Vice President of Sales Bossert would not speak with Adams, but spoke often with White employees.

190.    After his first year, Adams's performance was evaluated by Sodja as "Meets Expectations."

191.    In approximately June 2008, Adams met with Divisional Vice President John Poulsen to discuss working as an External Wholesaler.

192.    Poulsen told Adams he could not succeed as an External Wholesaler because of his appearance, including his weight. He weighed approximately 288 pounds at the time.

193.    In response to Poulsen's statement, Adams dieted and lost approximately 60 pounds but was not selected for any external wholesaler position.

194.    Thereafter, an employee who weighed over 300 pounds, Chris McNeal, was promoted to External Wholesaler in May 2010.

195.   In light of McNeal's promotion to External Wholesaler, Adams reasonably believed that Poulsen's previous comments about Adams' appearance in fact referred to his race.

196.   In mid-2008, Adams attended "The Academy."

197.   Adams was named "Top Gun" of The Academy, meaning he was the best in his class of six Internal Wholesalers at presentation skills, prospecting skills, product knowledge, and competitive intelligence.

198.   At the end of 2008, Adams' performance was evaluated by Sodja as "Exceeds Expectations."

199.   After completing The Academy and every three months for the next 18 months, Adams asked Sodja for approval to attend Boot Camp.

200.   Sodja refused to allow Adams to attend Boot Camp each time Adams asked for approval for the 18 months following Adams's completion of The Academy.

201.   In October 2009, Sodja finally approved for Adams to attend Boot Camp.

202.   Between the time Adams completed The Academy and October 2009, several White employees, including several hired after Adams, were approved to attend Boot Camp.

203.   Prior to October 2009, the Boot Camp test was an open-book exam, such that test-takers were allowed to rely on their notes and training materials. In October 2009, however, the Boot Camp participants were required to take the test without using any notes or training materials.

204.   Sodja did not coach or assist Adams with Boot Camp, despite assisting White employees.

205.    Because Sodja failed to coach or assist him, Adams did not pass the Boot Camp test in October 2009.

206.    Sodja refused to allow Adams to retake the Boot Camp test.  When Adams contacted a trainer in the Professional Development Unit, Shannon McNamara, for assistance with the portions of the Boot Camp test he had not passed, McNamara refused to assist Adams because she had been prohibited from doing so by Sodja.

207.    In June 2010, approximately seven months after Adams initially attended Boot Camp, Poulsen agreed to allow Adams to retake the Boot Camp test, on the condition that Adams "keep his mouth shut" and "watch" Poulsen's back.

208.    Adams reasonably believed that Poulsen's comments to "keep his mouth shut" and "watch" Poulsen's back referred to Adams not joining or supporting other Black employees who had filed charges of race discrimination.

209.    Adams retook the Boot Camp test on June 18, 2010.

210.    Sodja failed to show up to scheduled reviews of Adams's Boot Camp test results on at least ten occasions.

211.    When Sodja finally reviewed Adams's Boot Camp test results, Sojda nitpicked answers so that Adams's correct answers were scored as incorrect.

212.    As a result of Sodja's stringent review, Adams did not pass the Boot Camp test a second time.

213.    On July 30, 2010, Adams filed a charge of discrimination with the EEOC alleging that he was being denied promotions because of his race.

214.    Within two weeks of filing the charge of discrimination, Sodja stopped talking to Adams.

215.    After Adams filed his charge of discrimination, Bossert avoided Adams by turning and walking away when Adams approached.

216.    Adams was terminated on September 2, 2010, less than five weeks after filing a charge of discrimination.

**Alcena Gannaway**

217.    Alcena "Al" Gannaway, a Black male, was hired by Defendants as an Internal Wholesaler in January of 2005.

218.    Gannaway was named Outstanding Internal Wholesaler for two quarters in 2007 and 2008.

219.    In January 2009, Gannaway was asked to give the keynote speech at Jackson's National Sales Conference, the first time any employee below the Desk Director level had been asked to give such a speech.

220.    In early 2008, Gannaway applied for a Desk Director position but the position went to a White female, Candace Haynes.

221.    Vice President of Sales Justin Rafferty assured Gannaway he would be promoted to Desk Director the next time there was an opening.

222.    Contrary to Rafferty's representations, by the end of 2008, three more Desk Director positions became available and all three positions went to White employees.

223.    Although from January to March 2009, Gannaway served as an Acting Desk Director, when the position was filled on a permanent basis, Gannaway was denied the position in favor of a White employee.

224.    In November 2009, Gannaway was discharged for allegedly sending an unapproved email.

225.    However, the content of the email Gannaway sent had been previously approved for distribution in earlier emails.

**George Thomas Minas Hill**

226.    George Thomas Minas Hill, a Black male of African, Ethiopian, descent was hired in 2009 by Desk Director Rick Cooper as an intern pursuant to a Jackson program for college graduates.

227.    Hill often goes by his middle name "Minas," pronounced Mee- năs.

228.    In January 2010, Hill applied to be hired on fulltime as a Level I Internal Wholesaler selling variable annuities.

229.    A White female intern also applied for the same variable annuities position sought by Hill.

230.    The White female employee told Hill she did not really want the position selling variable annuities because she had little knowledge about variable annuities products and did not feel ready to work with products other than fixed income annuities.

231.    The White female employee, who had less training on variable annuities and less experience than Hill, was selected for the variable annuities Internal Wholesaler position over Hill.

232.    Hill was instead selected for a Level I Internal Wholesaler position selling fixed-income annuities.

233.    The variable annuities Internal Wholesaler position for which the White female employee was selected had significantly greater earning potential than the fixed-income annuities position for which Hill was selected.

234.    During the course of his employment, Hill was subjected to a racially hostile work environment. For example, after learning that Hill went by Minas, White employees refer to him as "Minus" and "C-Minus."

235.    White employees made "clicking" noises around Hill in reference to his African descent.

236.    Also based on Hill's appearance, including his goatee and bald head, White employees frequently called him "Montel Williams" or "Montel."

237.    In early 2011, Hill complained to Desk Director Peter Meyers about being referred to as "Minus," C-Minus," and "Montel Williams," and also complained about the clicking noises.

238.    Meyers did not take any action based on Hill's complaints.

239.    Hill completed all training requirements for advancement to Level II Internal Wholesaler.

240.    Cooper was subsequently transferred within the company.

241.    Several White employees with less experience and less tenure with the company, including employees Hill had trained, were promoted to Level II Internal Wholesaler while Hill remained as a Level I Internal Wholesaler.

242.    Hill asked Desk Directors Elizabeth Griffith, a White female, and Peter Meyers, a White male, why he was not advancing to Level II Internal Wholesaler.

243.    Griffin and Meyers both responded to Hill that they needed "more."

244.    When Hill pressed for examples of what Griffin and Meyers needed, neither provided any additional guidance.

245.    Employees who had passed a certification exam were encouraged by Jackson to assist other individuals preparing to take the exam and were also encouraged to review other individuals' answers from prior failed exams for purposes of retaking the exam.

246.    Consistent with Jackson's encouragement, in November 2011, Hill participated in a phone call to assist an advisor who was studying to retake a certification exam Hill had already passed.

247.    Hill was discharged for his coaching efforts, while White employees were not disciplined or discharged for similar efforts.

248.    When Hill attempted to ask questions about the basis for his termination, including requesting to listen to the recording of the phone conversation between Hill and the advisor to establish that he'd done nothing wrong, Amsberry in HR refused.

**Robert Blanchette**

249.    Robert Blanchette, a White male, was recruited by Defendants and hired in July 2009 to be the Vice President of JNLD's sales desk.

250.    At the time, Blanchette had nearly 24 years of experience in the financial services industry.

251.    Blanchette directly supervised 13 Desk Directors.

252.    Blanchette indirectly supervised the 250 Internal Wholesalers and BDCs that reported to the Desk Directors.

253.    Blanchette reported to Bossert, Senior Vice President of Sales, and Executive Vice President Greg Salsbury.

254.    Blanchette heard Bossert refer to Blacks as "pieces of shit."

255.    Blanchette heard Bossert refer to Ford and Funchess as "our two resident street walkers."

256.    Bossert asked Blanchette to monitor Funchess as she came and went.

257.    Bossert told Blanchette to look for reasons to get rid of Funchess and Ford.

258.    Desk Director Corey Walker frequently complained to Blanchette about Ford seeking to have her disciplined.

259.    Blanchette reviewed Ford's work and found she was performing very well, and Walker's complaints were unfounded. When Blanchette refused to take disciplinary action against Ford, Walker complained to Bossert about both Ford and Blanchette.

260.    Bossert became insistent that Blanchette act on Walker's complaints about Ford. Blanchette continued to refuse to discipline her because he saw no basis for the complaints.

261.    Blanchette believed, based on the remarks he'd heard Bossert make, that Bossert's animus toward Ford and Funchess was motivated by race.

262.    In January 2010, two Vice Presidents who also reported to Bossert, Paul Fitzgerald and Jack Mischler, asked Blanchette to meet them for breakfast at a restaurant.

263.    Mischler and Fitzgerald told Blanchette he wasn't a leader because he refused to get rid of Funchess and Ford.

28

264.   Fitzgerald and Mischler told Blanchette that they had received a termination notice with Blanchette's name on it from Bossert's administrative assistant.

265.   Blanchette understood Fitzgerald and Mischler were saying that his refusal to discipline or fire Ford meant that Blanchette was about to be fired.

266.   Fitzgerald and Mischler also told Blanchette that CEO Clifford Jack was concerned about the EEOC charges filed by Ford and others.

267.   Fitzgerald and Mischler implied that if Blanchette fired Ford and Funchess, he would not be fired.

268.   Blanchette responded that both Ford and Funchess were performing well and his reviews of their work would be fair.

269.   On February 17, 2010, Blanchette gave Ford an annual evaluation, rating her as "Meets Expectations."

270.   The following day, Feburary 18, 2010, Bossert fired Blanchette.

## FIRST CLAIM FOR RELIEF
### [Discrimination Based on Race – U.S.C. §§ 2000e-2(a) & 2000e-5(f)(1)]

271.   The allegations contained in the foregoing paragraphs are incorporated by reference.

272.   Defendants discriminated against La'Tonya Ford, Kimberly Funchess, Marietta Vargas, Kontar Mwamba, Kenneth Conley, Marcus Adams, Alcena Gannaway, George Thomas Minas Hill, and other aggrieved individuals because of race in violation of section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a), by denying them promotions, affording them less favorable terms and conditions of employment, paying disparate compensation, and discharging or constructively discharging them because of their

race, and by creating and tolerating a work environment that was hostile because of race.

273.   The effect of the practices complained of above has been to deprive Ford, Funchess, Vargas, Mwamba, Conley, Adams, Gannaway, Hill, and other aggrieved individuals equal employment opportunities, and otherwise adversely affect their status as employees because of their race.

274.   The unlawful employment practices complained of above were intentional.

275.   The unlawful employment practices complained of above were done with malice or reckless indifference to the federally protected rights of Ford, Funchess, Vargas, Mwamba, Conley, Adams, Gannaway, Hill, and other Black and/or African-American employees who were aggrieved by the discriminatory practices.

## SECOND CLAIM FOR RELIEF
### [Discrimination Based on Sex – 42 U.S.C. §§ 2000e-2(a) & 2000e-5(f)(1)]

276.   The allegations contained in the foregoing paragraphs are incorporated by reference.

277.   Defendants discriminated against La'Tonya Ford, Kimberly Funchess, Marietta Vargas, and other aggrieved female employees because of their sex, female, in violation of section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a), by denying them promotions, affording them less favorable terms and conditions of employment, paying disparate compensation, and discharging or constructively discharging them because of their sex, and by creating and tolerating a sexually hostile work environment.

278.   The effect of the practices complained of above has been to deprive Ford, Funchess, Vargas, and other aggrieved female employees equal employment

opportunities, and otherwise adversely affect their status as employees, because of their sex, female.

279.    The unlawful employment practices complained of above were intentional.

280.    The unlawful employment practices complained of above were done with malice or reckless indifference to the federally protected rights of Ford, Funchess, Vargas, and other female employees who were aggrieved by the discriminatory practices.

## THIRD CLAIM FOR RELIEF

### [Discrimination based on National Origin – 42 U.S.C. §§ 2000e-3(a)]

281.    The allegations contained in the foregoing paragraphs are incorporated by reference.

282.    Defendants discriminated against Marietta Vargas, George Thomas Minas Hill, and other aggrieved employees because of their origin from countries in Africa, including, but not limited to, Ethiopia and the Republic of Cabo Verde, in violation of section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a), by denying them promotions, affording them less favorable terms and conditions of employment, paying disparate compensation, and discharging or constructively discharging them because of their national origin, and by creating and tolerating a hostile work environment based on national origin.

283.    The effect of the practices complained of above has been to deprive Vargas, Hill, and other aggrieved employees equal employment opportunities, and otherwise adversely affect their status as employees, because of their national origin.

284.    The unlawful employment practices complained of above were intentional.

285.   The unlawful employment practices complained of above were done with malice or reckless indifference to the federally protected rights of Vargas, Hill, and other employees who were aggrieved by the discriminatory practices.

**FOURTH CLAIM FOR RELIEF**
**[Retaliation – 42 U.S.C. §§ 2000e-3(a)]**

286.   The allegations contained in the foregoing paragraphs are incorporated by reference.

287.   Defendants engaged in unlawful employment practices, in violation of Section 704 of Title VII, 42 U.S.C. § 2000e-3(a), by retaliating against La'Tonya Ford, Kimberly Funchess, Marietta Vargas, Kontar Mwamba, Kenneth Conley, Marcus Adams, George Thomas Minas Hill, Robert Blanchette, and other aggrieved individuals, because they filed charges of discrimination and/or opposed what they reasonably and in good faith believed were unlawful discriminatory employment practices because of sex and/or race.

288.   The effect of the practices complained of above has been to deprive Ford, Funchess, Vargas, Mwamba, Conley, Adams, Hill, Blanchette, and other aggrieved individuals of equal employment opportunities, and otherwise adversely affect their status as employees, because they filed charges of discrimination and/or opposed practices made unlawful by Title VII.

289.   The unlawful employment practices complained of above were intentional.

290.   The unlawful employment practices complained of above were done with malice or reckless indifference to the federally protected rights of Ford, Funchess, Vargas, Mwamba, Conley, Adams, Hill, Blanchette, and other employees aggrieved by the unlawful employment practices.

## PRAYER FOR RELIEF

Wherefore, the Commission respectfully requests that this Court:

A.      Grant a permanent injunction enjoining Defendants, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from engaging in unlawful employment discrimination because race and, sex, and from engaging in unlawful retaliation.

B.      Order Defendants to institute and carry out policies, practices, and programs which provide equal employment opportunities for female, Black and/or African-American employees and applicants, and which eradicate the effects of their past and present unlawful employment practices.

C.      Order Defendants to make whole La'Tonya Ford, Kimberly Funchess, Marietta Vargas, the Estate of Kontar Mwamba, Kenneth Conley, Marcus Adams, Alcena Gannaway, , George Thomas Minas Hill, Robert Blanchette, and other aggrieved individuals, by providing appropriate backpay with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of their unlawful employment practices, including but not limited to reinstatement with an appropriate promotion, or front pay in lieu thereof.

G.      Order Defendants to make whole La'Tonya Ford, Kimberly Funchess, Marietta Vargas, the Estate of Kontar Mwamba, Kenneth Conley, Marcus Adams, Alcena Gannaway, George Thomas Minas Hill, Robert Blanchette, and other aggrieved individuals by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described in above, in amounts to be determined at trial.

H.      Order Defendants to make whole La'Tonya Ford, Kimberly Funchess, Marietta Vargas, Kenneth Conley, Marcus Adams, Alcena Gannaway, George Thomas Minas Hill, Robert Blanchette, and other aggrieved individuals by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices complained of above, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in amounts to be determined at trial.

I.      Order Defendants to pay La'Tonya Ford, Kimberly Funchess, Marietta Vargas, the Estate of Kontar Mwamba, Kenneth Conley, Marcus Adams, Alcena Gannaway, George Thomas Minas Hill, Robert Blanchette, and other aggrieved individuals punitive damages for their discriminatory conduct described above, that was malicious or done with reckless indifference for the employees' federally protected rights, in amounts to be determined at trial.

J.      Grant such further relief as the Court deems necessary and proper in the public interest.

K.      Award the Commission its costs of this action.

/s/ Kathy D. Boutchee
Senior Trial Attorney
  EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Houston District Office
1919 Smith Street, Suite 600
Houston, TX 77002
Phone: (713) 651-4913
kathy.boutchee@eeoc.gov

Michael Imdieke
 Trial Attorney
Iris Halpern
 Senior Trial Attorney

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Denver Field Office
303 E 17th Avenue, Suite 410
Denver, CO 80203
Phone: (303)-866-1320
Phone: (303)-966-1374
Email: michael.imdieke@eeoc.gov
Email: iris.halpern@eeoc.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 27, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

Christopher J. DeGroff
Gerald L. Maatman, Jr.
Alex W. Karasik
Andrew L. Scroggins
Christina M. Janice
Seyfarth Shaw LLP
131 South Dearborn Street, Suite 2400
Chicago, IL
Tel: 312-460-5000
Fax: 312-460-7000
cdegroff@seyfarth.com
akarasik@seyfarth.com
gmaatman@seyfarth.com
ascroggins@seyfarth.com
cjanice@seyfarth.com

**Attorneys for Defendants**


Brian Moore
Jester Gibson & Moore, LLP
1999 Broadway Ste. 3225
Tel: 303-337-7888
bmoore@jgllp.com

Justin M. Plaskov
Lynn D. Feiger
Lohf Shaiman Jacobs Hyman & Feiger PC
950 South Cherry Street #900
Denver, CO 80246
Tel: 303-753-9000
jplaskov@lohfshaiman.com
lfeiger@lohfshaiman.com

**Attorneys for Plaintiff-Intervenors**


s/ Kathy Boutchee
Senior Trial Attorney