IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 16-cv-02472-PAB-SKC

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,[1]

Plaintiff,

and

LA'TONYA FORD,

Plaintiff-Intervenor,

v.

JACKSON NATIONAL LIFE INSURANCE COMPANY,
JACKSON NATIONAL LIFE DISTRIBUTORS, LLC, and
JACKSON NATIONAL LIFE INSURANCE COMPANY OF NEW YORK,

Defendants.

---

**ORDER**

---

This matter is before the Court on defendants' Motion for Summary Judgment [Docket No. 204] and Motion to Strike Evidentiary Exhibits to and New Facts in Plaintiff's Surreply in Opposition to Defendants [sic] Motion for Summary Judgment [Docket No. 247]. Plaintiff La'Tonya Ford ("Ford") responded to defendants' motion, Docket No. 210, to which defendants replied. Docket No. 221. Ms. Ford then sought leave to file a surreply, Docket No. 224, which the Court granted. Docket No. 225. Ms. Ford filed her surreply, Docket No. 233, and defendants moved to strike the surreply.

[1] The Equal Employment Opportunity Commission, the plaintiff-intervenors – with the exception of plaintiff-intervenor La'Tonya Ford – and defendants entered into a consent decree, which resolved all of the plaintiff-intervenors' claims. Docket No. 182.

Docket No. 247.[2] This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I. BACKGROUND[3]

Defendants, referred to collectively as "Jackson," manufacture and sell annuities through three distribution channels, institutional market group ("IMG"), regional broker dealer division ("RBD"), and Jackson National Life Distribution ("JNLD"). Docket No. 204 at 3, ¶¶ 1–2. Sales efforts at Jackson are supported by four positions, internal wholesaler, business development consultant ("BDC"), desk director, and external wholesaler. *Id.*, ¶¶ 3–5.

Ms. Ford joined Jackson in Atlanta and was then invited, as one of 20 key employees, to relocate to Denver. *Id.*, ¶ 8. She accepted this offer, received a retention bonus in October 2006, and relocated in January 2007. *Id.* at 4, ¶ 9. Around the time of her move to Denver, Ms. Ford's sales area changed to the New York territory within the RBD East channel. *Id.* ¶ 10.

Jackson made its associate handbook accessible to employees and provided

---

[2] Defendants' summary judgment motion, reply, and motion to strike do not comply with the Local Rules. *See* D.C.COLO.LCivR 10.1(e) ("All pleadings and documents shall be double spaced."). Jackson's reply also violates two of the Court's practice standards. First, Jackson fails to respond to each of Ms. Ford's additional disputed facts. The Court's practice standards state that a reply brief must "either admit that [a] fact is disputed or supply a **brief** factual explanation for its position that the fact is undisputed, accompanied by a **specific reference** to material in the record which establishes that the fact is undisputed. This will be done in paragraphs numbered to correspond with the opposing party's paragraph numbering." *See* Practice Standards (Civil cases), Chief Judge Philip A. Brimmer § III.F.3.b.vi. Second, because "the sole purpose of these procedures is to establish facts and determine which of them are in dispute," in engaging in legal argument in this section, Jackson violates the Court's requirement that, "**[l]egal** argument is not permitted here and should be reserved for separate portions of the briefs." *Id.* at § III.F.3.b.vii.

[3] All facts are undisputed unless otherwise noted.

training on the policies and procedures, including its anti-harassment and anti-discrimination policies. *Id.*, ¶¶ 12, 14–16.

Around January 2008, Ms. Ford attended a party at the home of John Poulsen, a Jackson employee, with at least 20 internal wholesalers from RBD. *Id.* at 5, ¶ 26. Brian Lane, who was Ms. Ford's supervisor and who left Jackson at the end of 2008, also attended. *Id.* at 6, ¶¶ 27–28. Ms. Ford states that, during the party, Mr. Poulsen placed a "4-foot 'magnum' vodka 'bottle against his pelvic area' and started 'thrusting the bottle'" at Ms. Ford, saying, "'Here, LT, get on your knees.'" *Id.*, ¶ 29 (quoting Docket No. 204-7 at 40, 283:17–284:13). In addition, in 2008 and 2009, Alex Crosby, a co-worker, "made comments about Ms. Ford's breasts and appearance, asked [Ms.] Ford what bra size she wore, and commented on a female co-worker's appearance." *Id.*, ¶ 32.

Also in 2008, Jackson gave sales employees stress balls. *Id.* at 4, ¶ 17. Some employees threw the balls at each other. *Id.* at 5, ¶ 18. At one point, Ms. Ford complained about the ball throwing to Mr. Lane and Corey Walker, who became her supervisor, and stated that she would either "go to HR" or "to the police department" to file "an assault charge." *Id.*, ¶ 19. Mr. Walker then sent an email to employees about the ball throwing. *Id.*, ¶ 20.

On August 18, 2009, Mr. Walker gave Ms. Ford a verbal warning that she was spending too little time on the phone with customers. *Id.* at 7, ¶ 39. Mr. Walker also received reports of rudeness by Ms. Ford from her co-workers. *Id.*, ¶ 40. On September 11, 2009, Ms. Ford was presented with a performance improvement plan

("PIP"). *Id.*, ¶ 43.[4]

Ms. Ford complained to human resources about "the full range of things" that she felt were discriminatory at Jackson, including telling Jennifer Amsberry, a human resources manager, about hearing discussions "for months between [Mr.] Crosby and male [co-workers] about what [Ms. Ford] assumed was pornographic content on his computer." *Id.* 8, ¶¶ 50–51. This complaint was to communicate "every incident that ha[d] happened to [Ms. Ford] during that time period under Corey [Walker]'s rule" or at least "a majority of the ones that [she] could think of at that time period" and "to be comprehensive." *Id.*, ¶ 52 (quoting Docket No. 204-7 at 23, 177:4–178:2). After this, at least some of Mr. Crosby's inappropriate comments stopped. *Id.*, ¶ 54.[5] Later, Gary Stone, head of human resources, and Ms. Amsberry investigated Ms. Ford's allegations. *Id.* at 9, ¶ 58.[6] Ms. Amsberry interviewed six associates, including two who Ms. Ford specifically chose. *Id.*, ¶ 59. Mr. Stone then rescinded the PIP. *Id.*, ¶ 62

---

[4] The parties dispute the events surrounding the PIP. Jackson states that when Mr. walker tried to present Ms. Ford the PIP, she walked out of the meeting before he could explain it. Docket No. 204 at 7, ¶ 44. Ms. Ford states that it was Mr. Walker who left the meeting after Ms. Ford asked for human resources to be included in the discussion. Docket No. 210 at 5, ¶ 44. Further, while Jackson states that Ms. Ford never considered herself subject to the PIP, Docket No. 204 at 8, ¶ 47, Ms. Ford states that she did not know when the PIP became enforced and believed that it was still effective when she asked human resources about it later. Docket No. 210 at 5, ¶ 47.

[5] The parties dispute the extent to which Mr. Crosby's stopped making inappropriate comments. Jackson contends that he stayed away from Ms. Ford, stopped making sexual remarks, and stopped discussing pornography. *Id.* Ms. Ford states that only some of Mr. Crosby's comments stopped. Docket No. 210 at 6, ¶ 54.

[6] Jackson states that the investigation found Ms. Ford's allegations of harassment and discrimination unsubstantiated. *Id.* Ms Ford, however, characterized the investigation as insufficient. Docket No. 210 at 6, ¶ 58.

Mr. Stone recalled that Ms. Ford made many complaints, including about her bonus, her place in "contests," and to whom she reported. *Id.* at 10, ¶ 64. Mr. Stone then launched another months-long investigation, spoke to many current and former employees, pulled data from Jackson's systems on calls, listened to phone calls, and was described by Ms. Ford as always calling or meeting with her; he investigated every allegation that Ms. Ford made. *Id.*, ¶¶ 65–66.

In February 2010, Bob Blanchette, then Vice President of National Sales Development, gave Ms. Ford a "meets expectations" rating in her 2009 performance review, which Ms. Ford believed was fair, and a one-percent merit pay increase. *Id.*, ¶¶ 67–69. After complaining about her merit increase and discretionary bonus, Ms. Ford received additional compensation. *Id.*, ¶ 70. Ms. Ford can identify no male or white BDC with an overall "meets expectations" performance rating who was given a larger pay increase in 2010, and while Ms. Ford may believe that she should have received the BDC of the year award in 2009, she can present no evidence that she was similarly situated to the award winner.[7] *Id.* at 10, ¶¶ 71–72.

After Mr. Blanchette was terminated in February 2010, Ms. Ford reported to Mr. Bossert, and her territory was realigned when Jackson added twelve additional BDCs. *Id.* at 11, ¶¶ 73–74. While Ms. Ford's commission depended on territory sales relative to targets, after Jackson realigned Ms. Ford's territory, Jackson adjusted the

---

[7] Ms. Ford purports to deny this allegation, but merely states that she and Mr. Batla were the only BDCs in RBD at that time, and they had the same position, responsibilities, and reporting structure. Docket No. 210 at 7, ¶¶ 71–72. Mr. Batla's race, however, is not stated. She does not dispute the substance of the allegation. Thus, ¶ 71 and ¶ 72 of Docket No. 204 are deemed admitted.

compensation formula. *Id.*, ¶¶ 75–76.[8]

Ms. Ford became a BDC, with an increased base salary, on January 26, 2009. *Id.* at 6, ¶ 34. The next step would be promotion to external wholesaler, and candidates named to a "short list" were eligible to become an external wholesalers. *Id.*, ¶ 35. Being on the short list required passing training courses, including a "boot camp," and a professionalism "finishing school." *Id.* at 7, ¶ 36. Ms. Ford passed boot camp on August 22, 2018 and, after completing finishing school in January 2009, was named to the short list. *Id.*, ¶¶ 37–38.

External wholesalers were highly-paid, and the selection process was sometimes competitive. *Id.* at 11, ¶¶ 77–78. "RDs"[9] had discretion to choose candidates when filling open positions and could consider things like the territory and clients, whether candidates had relationships in the region, and objective performance criteria. *Id.* at 11–12, ¶¶ 78–82.

Ms. Ford applied to eight external wholesaler positions at Jackson, for which she believes she was passed over due to her race or gender. *Id.* at 12, ¶ 87. For two positions, Ms. Ford disputes the veracity of the hiring manager's proffered rationale for selecting someone else, *id.* at 12–13, ¶¶ 89, 92, and for another position, Ms. Ford disputes that she was not the best applicant and states that the hiring manager stated

[8] The parties dispute the effect of this adjustment. Jackson states that the compensation remained "exactly the same," *id.*, ¶ 76, while Ms. Ford states that her compensation did not remain "exactly the same" because "a number of variables were put into the [new salary] equation." Docket No. 210 at 8, ¶ 76.

[9] This term is undefined in the parties' briefs; however, the term may refer to regional directors. *See, e.g.*, Docket No. 204 at 17.

he hired another applicant because of the applicant grew up in the sales region. *Id.* at 13, ¶ 91. Ms. Ford also applied to two other positions in the IMG channel – one of which was filled by an African American man, who had experience in IMG, and the other was filled by someone who had performed very well in a BDC role. *Id.*, ¶ 93–95.

Ms. Ford heard a person use the word "n***er" on the sales desk on one occasion.[10] Docket No. 210 at 15, ¶ 144. In addition, Mr. Blanchette recalls that at least one manager referred to Ms. Ford and another Black woman employee as "Black bitches" or "Black Panthers."[11] *Id.*, ¶ 143.

In the summer of 2010, Ms. Ford began to search for an external wholesaler position in another organization and, once she received an offer at a Jackson competitor, posted on Facebook, "I got a new job. Gonna tell my current company 2 kick rocks on Tuesday." Docket No. 204 13, ¶¶ 96–98. On October 12, 2010, Ms. Ford sent an email to Mr. Stone and Ms. Amsberry titled "LaTonya Ford Letter of Resignation"; Mr. Stone emailed her several hours later and asked Ms. Ford to call him. *Id.*, ¶¶ 99–100. After the two spoke, Ms. Ford provided her two-weeks' notice because she had her Series 7 and was offered a position to be an external wholesaler at Nationwide Financial. *Id.* at 13–14, ¶¶ 101–02.

That afternoon, as Ms. Ford was getting ready to leave work, Andy Foy, a

---

[10] Jackson does not deny this fact, but rather states that Ms. Ford testified that she only heard the word used once and that it was in the context of a co-worker telling a story. Docket No. 221 at 3.

[11] Jackson does not deny this fact, but rather states Mr. Blanchette attributes the phrase "Black bitches" to a particular manager and does not attribute "Black Panthers" to anyone in particular. The Court therefore deems this fact as admitted.

coworker, was "tossing in his hands a BlackRock promotional football that had been defaced to replace the 'R' with a 'C'." *Id.* at 14, ¶ 103. After Mr. Crosby said, "Andy, I bet you won't show LT that ball," Mr. Foy threw the ball toward Ms. Ford. *Id.*, ¶ 104 (quoting Docket No. 204-7 at 45, 313:17–22). Ms. Ford caught the ball, dropped it, packed her belongings, and left. *Id.*, ¶ 105. Ms. Ford contacted Mr. Stone about the incident. *Id.*, ¶ 106. Mr. Stone flew to Denver and conducted an investigation, after which Mr. Foy and Mr. Crosby were fired. *Id.*, ¶ 107. Jackson's president wrote Ms. Ford an apology letter and held a meeting of people in the Denver office, where he confirmed and reinforced that such behavior would not be tolerated, and the company launched company-wide training. *Id.*, ¶¶ 108–09.

## II. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986). A disputed fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quotations omitted). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotations omitted). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman*, 252 F.3d at 1115. When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*

## III. ANALYSIS

Ms. Ford brings five claims for relief against Jackson. Docket No. 51 at 18–22. These claims are for race- and sex-based hostile work environment, race- and sex-based discrimination, and retaliation. *Id.* The Court considers Ms. Ford's discrimination claims first they bear on her hostile work environment claims.

### A. Discrimination Claims

Ms. Ford contends that she was discriminated against "in almost all terms and conditions of employment" in violation of Title VII. *Id.* at 2, at 4, ¶ 8. Jackson argues it

is entitled to summary judgment on Ms. Ford's discrimination claims because Jackson took no adverse action against her on account of her race or sex, or for engaging in protected activity. Docket No. 204 at 15. To the contrary, Jackson argues, Ms. Ford more than doubled her salary, advanced through three internal wholesaler levels, was promoted to BDC, and was on track to become an external wholesaler. *Id.* at 14. Jackson claims that she was never disciplined (except for the rescinded PIP) and was not subject to demotion, loss of pay, or other adverse employment consequence. *Id.* at 15. Jackson also states that Ms. Ford cannot show any damages, since she was not fired, but rather quit voluntarily to work for a competitor. *Id.*

Title VII makes it unlawful "for an employer . . . to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin." *See* 42 U.S.C. § 2000e-2(a)(1). Such claims can be demonstrated either by "direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic" or by "using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1345 (2015). Jackson argues that under the framework of *McDonnell Douglas*, Ms. Ford cannot make out a prima facie case of discrimination because Jackson did not take any adverse action against Ms. Ford. Docket No. 204 at 15. Ms. Ford argues that there is evidence of direct discrimination and, as a result, the *McDonnell Douglas* framework is inapplicable. *See* Docket No. 210 at 19–20. However, Ms. Ford contends that, even if *McDonnell Douglas* is applicable, she has satisfied her burden to survive summary judgment. *See id.* at 20.

### *1. Direct Evidence of Discrimination*

"When a Title VII plaintiff presents direct evidence of discrimination, the *McDonnell Douglas* burden-shifting analysis doesn't apply." *See Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 883 (10th Cir. 2018) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)). "Direct evidence demonstrates on its face that the employment decision was reached for discriminatory reasons." *Id.* (citation omitted). Evidence is direct only if it "proves the existence of a fact in issue without inference or presumption." *Id.* (citation omitted).

Ms. Ford argues that direct evidence of discrimination is found in Mr. Bossert's repeated use of "objectively racist and offensive language" when referring to Ms. Ford and other Black employees. Docket No. 210 at 19–20. Moreover, Ms. Ford states that there is no question that Mr. Bossert's words were intended to describe Ms. Ford and other Black employees, and that Mr. Bossert had a hand in deciding who would be promoted. *Id.* The Court finds Ms. Ford's arguments unpersuasive.

First, while Ms. Ford provides examples of Mr. Bossert's offensive remarks and statements opposed to Ms. Ford's promotion, *see, e.g.*, *id.* at 13, ¶ 134, Ms. Ford provides no evidence that Mr. Bossert actually made any promotion decisions. Sexist comments by those who were not decisionmakers are irrelevant to the analysis. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1217 (10th Cir. 2013) (noting that statements "by a decisionmaker" can demonstrate direct discrimination); *see also Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994) ("[C]omments by non-decision makers are not material."). Rather, Ms. Ford admits that RDs had discretion to choose

the most qualified candidates when filling open positions for external wholesalers and were free to consider factors that were not objective, including whether candidates already had relationships with advisors in the area and the makeup of the territory and its clients. Docket No. 204 at 11, ¶¶ 79, 81. Because it is undisputed that RDs chose external wholesalers, and there is no evidence in the record, disputed or undisputed, demonstrating discrimination by any RDs, Ms. Ford has not demonstrated a material issue of disputed fact regarding direct evidence of discrimination.

Second, even if the comments by Mr. Bossert were relevant, they still would be insufficient to demonstrate direct evidence. "[A] supervisor's animosity towards a protected group generally is not – on its own – direct evidence of discrimination. Rather, the plaintiff must show that the supervisor 'acted on his or her discriminatory beliefs.'" *Fassbender*, 890 F.3d at 883 (quoting *Tabor*, 703 F.3d at 1216). In *Fassbender*, a supervisor made several comments regarding her employees' pregnancies and stated that she desired to have fewer pregnant subordinates. *Id.* However, the Tenth Circuit found this insufficient to demonstrate direct evidence of discrimination because, even though the supervisor made these comments, "she didn't suggest that [the plaintiff's] pregnancy somehow made her unqualified for her position." *Id.* Because this evidence did not "demonstrate[] on its face" that the supervisor fired the plaintiff due to her pregnancy, there was no evidence of direct discrimination. *See Fassbender*, 890 F.3d at 883. Ms. Ford runs into the same issue here. While Mr. Bossert may have made comments that indicate he was opposed to Ms. Ford's promotion, Ms. Ford provides no direct evidence that he acted on his beliefs – since he

did not choose which applicants became external wholesalers – or that was able to convince RDs not to advance Ms. Ford because of her race or sex. “Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption,” *Hall v. U.S. Dep’t of Labor*, 476 F.3d 847, 854 (10th Cir. 2007), because it “demonstrates on its face that the employment decision was reached for discriminatory reasons,” *Danville v. Regional Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002). Stray remarks in the workplace do not constitute direct evidence of discrimination; rather, a “plaintiff must show that the employer actually relied on” the discriminatory belief in rendering a decision. *Heim v. Utah*, 8 F.3d 1541, 1547 (10th Cir. 1993). As a result, Ms. Ford has not provided direct evidence of discrimination.

***2.* McDonnell Douglas *Factors***

A plaintiff who is unable to demonstrate direct evidence of discrimination may meet her burden with circumstantial evidence. *See Fassbender*, 890 F.3d at 884. To consider allegations made with circumstantial evidence, the Court applies the *McDonnell Douglas* three-step burden-shifting framework. *See id.* (citing *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315-16 (10th Cir. 2017)). Under the first step, the plaintiff must “establish a prima facie case of discrimination.” *Id.* (citing *Bird v. W. Valley City*, 832 F.3d 1188, 1200 (10th Cir. 2016)).[12]

To make out a prima facie sex- or race-based discrimination case, a plaintiff

[12] If the plaintiff succeeds in making a prima facie case, the second step requires the defendant “to articulate a legitimate, nondiscriminatory reason” for the personnel action. *See E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007). At the third step, the burden shifts back to the plaintiff to “show [that] there is a genuine issue of material fact as to whether the proffered reasons are pretextual.” *See Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005).

must show (1) she is a member of a protected class, which the parties do not dispute in this case; (2) she suffered an adverse employment action; and (3) she was treated less favorably than similarly situated employees not in the protected class. *See, e.g.*, *Trujillo v. Univ. of Colo. Health Sci. Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998).

The bulk of the parties' dispute on this issue is whether Ms. Ford suffered an adverse employment action. The Tenth Circuit liberally defines "adverse employment action." *See, e.g.*, *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998); *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1264 (10th Cir. 1998); *Jeffries v. Kansas*, 147 F.3d 1220, 1232 (10th Cir. 1998). Courts take "a case-by-case approach," examining the unique factors relevant to the situation at hand. *Jeffries*, 147 F.3d at 1232. However, an adverse employment action does not include "a mere inconvenience or an alteration of job responsibilities." *Sanchez*, 164 F.3d at 532, *citing Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (conduct is an adverse employment action if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").

Ms. Ford alleges two adverse employment actions: Jackson's failure to promote Ms. Ford and the discriminatory "terms and conditions" of Ms. Ford's employment, including Jackson's manipulation of the territories to which Ms. Ford was assigned. *See generally*, Docket No. 210.

**a. Failure to Promote**

For a Title VII failure-to-promote claim, a plaintiff must make a prima facie case by showing that (1) she was a member of a protected class; (2) she applied for and was qualified for a position; (3) despite being qualified, she was rejected; and (4) after she was rejected, the position was filled. *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000). If the plaintiff can establish a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment action. *Jones*, 349 F.3d at 1266; *see also Garrett v. Hewlett–Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002). If the defendant can articulate a permissible reason for the action, the burden then shifts back to the plaintiff to show that the proffered reasons are pretextual. *Plotke*, 405 F.3d at 1099. The parties do not seem to dispute that Ms. Ford has made a prima facie case. *See, e.g.*, Docket No. 204 at 17–19.

Ms. Ford focuses her challenge on eight specific external wholesaler positions, yet two of these positions fall outside the 300-day limitations period that began when she filed her first EEOC charge.[13] For the remaining positions, Jackson asserts that there is no evidence that Ms. Ford's non-selection was based on her race or gender; rather, Jackson claims that successful candidates were more qualified than Ms. Ford, which is a legitimate, nondiscriminatory reason for not promoting Ms. Ford. *Id.* at

[13] Jackson argues that because Ms. Ford challenges discrete acts by Jackson, these are analyzed under the *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002), standard. Docket No. 204 at 17–18. Ms. Ford asserts that, even if two of the instances that she cites for not being promoted are time-barred, the Court may still consider them as admissible evidence in support of her other claims. Docket No. 210 at 21. The Court will therefore return to these arguments in its analysis of Ms. Ford's hostile work environment and constructive discharge claims.

18–19. Ms. Ford seems to agree. *See* Docket No. 210 at 22 ("there is also sufficient evidence of such weaknesses, implausibilities, inconsistencies, or contradictions" in Jackson's proffered legitimate reasons for its actions). The Court finds that the undisputed facts indicate that Jackson has provided legitimate nondiscriminatory reasons that hiring managers chose candidates other than Ms. Ford. *See* Docket No. 204 at 12–13, ¶¶ 88–95.

The Court thus proceeds to the third *McDonnell Douglas* prong. A plaintiff can show pretext by showing that the plaintiff's protected status, here Ms. Ford's race and sex, were determinative factors in the employment decisions or that a "discriminatory reason more likely motivated the employer" or the employer's explanation is "unworthy of credence." *McDonnell Douglas*, 411 U.S. at 804–805; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517 (1993). "To show that the defendant's proffered race-neutral reasons were actually a pretext for discrimination, [the Tenth Circuit] has held that the plaintiff must demonstrate that the defendant's 'proffered [race-neutral] reasons were so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief.'" *Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (quoting *Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004)). "The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City and Cnty. of Denver*, 365 F.3d 912, 924–25 (10th Cir. 2004) (internal quotation marks and alteration omitted); see also *Kendrick*, 220 F.3d at 1231 ("[A] challenge of pretext requires us to look at the facts as

they appear to the person making the decision to terminate plaintiff."). To "suggest that an employer's claim that it hired someone else because of superior qualifications is pretext for discrimination rather than an honestly (even if mistakenly) held belief, a plaintiff must come forward with facts showing an 'overwhelming' 'disparity in qualifications.'" *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1211 (10th Cir. 2010) (quoting *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1309 (10th Cir. 2005) (per curiam)).

Ms. Ford argues that she was more qualified than her white, male co-workers who were promoted over her, that she outperformed her male co-workers, had better credentials, and was acknowledged as an excellent performer. Docket No. 210 at 22. She also cites statistical data on Jackson's history of advancing women, African Americans, and African American women. *Id.* at 24 (citing *Fallis v. Kerr-McGee Corp.*, 944 F.2d 743, 746 (10th Cir. 1991) ("It is uniformly recognized that statical data showing an employer's pattern of conduct toward a protected class can create an inference that an employer discriminated against individual members of the class.")). The undisputed facts establish, however, that hiring managers had broad discretion to choose external wholesalers based on a host of non-objective criteria. Docket No. 204 at 11–12, ¶¶ 79–82. The facts do not, therefore, indicate that there was an overwhelming disparity in qualifications for the external wholesaler role that favored Ms. Ford, given the managers' discretion, and while Ms. Ford claims that Mr. Bossert did not support Ms. Ford's promotion, *see, e.g.*, *id.* at 13–14, ¶¶ 134–35, Ms. Ford's allegations are based on inadmissible hearsay, and she has not alleged that Mr. Bossert was the Jackson official in charge of hiring for any of the positions that she applied to. Nor has Ms. Ford provided any evidence that Jackson did not "honestly believe" that other

candidates were more qualified than she was. *See Rivera*, 365 F.3d at 924–25. Ms. Ford has not established, therefore, that Jackson's proffered justifications for choosing other applicants were pretext for race- or sex-based animus. The Court finds that Ms. Ford has failed to raise a genuine issue of material fact as to whether Jackson's proffered reasons for not promoting her were pretextual.

***3. Terms and Conditions of Employment***

The Court next considers Ms. Ford's allegations that Jackson discriminated against her in affording her less favorable terms and conditions employment. Docket No. 210 at 20. Ms. Ford argues that she was not treated like her similarly situated white and male employees and that "Jackson manipulated its territories to Ms. Ford's detriment so that her earning potential was unfairly decreased" by engaging in "a pattern of conduct whereby Ms. Ford's territories were handed to her white or male co-workers, who she then had to train." *Id.* As noted above, to establish this claim, Ms. Ford must show that (1) she is a member of a protected class; (2) she was subject to an adverse employment action concerning the terms and conditions of her employment; and (3) similarly situated employees who are not members of the protected class were treated more favorably. *Trujillo*, 157 F.3d at 1215; *see also Haithcox v. GEO Grp., Inc.*, No. 07-cv-00160-REB-MEH, 2008 WL 2302649, at *4 (D. Colo. May 30, 2008), *order clarified*, 2008 WL 2396808 (D. Colo. June 9, 2008). Unlike the failure-to-promote inquiry, the question here is whether Jackson's treatment of Ms. Ford rises to the level of an adverse action.

To determine whether a plaintiff suffered an adverse employment action, courts

take a "case-by-case approach," analyzing the unique factors in each situation. *Sanchez*, 164 F.3d at 532; *see also Dickerson v. Bd. of Trustees of Metro. State Univ. of Denver*, No. 19-cv-2087-WJM-SKC, 2021 WL 492483, at *8 (D. Colo. Feb. 10, 2021). One factor a court uses to determine an adverse action is whether the action causes "harm to future employment prospects." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004) (citation omitted). An employer's act must do more than de minimis harm and must be "materially adverse to the employee's job status." *Id.* at 1033. In other words, adverse employment actions are those that constitute a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1217 (10th Cir. 2003) (quoting *Burlington*, 524 U.S. at 761). "Minor employment actions which make an employee unhappy are not sufficiently adverse as to form grounds for a discrimination suit." *Aluru v. Anesthesia Consultants*, 176 F. Supp. 3d 1116, 1125 (D. Colo. 2016) (citation omitted).

The Court first considers Ms. Ford's concerns that she was not treated like her white, male co-workers in her evaluations. *See* Docket No. 210 at 21. There is a dispute as to whether Mr. Walker either did not evaluate Ms. Ford or evaluated her late and whether this placed Ms. Ford at a disadvantage compared to her similarly situated white and male co-workers who knew Mr. Walker's expectations and were thereby better positioned to advance. *Id.* at 11–12, ¶¶ 116–120. However, notwithstanding these disputes, Jackson insists that Ms. Ford cannot make out a prima facie case of

discrimination because she cannot show similarly situated white or male employees received higher pay, or that Jackson's decisions constituted an adverse action. Docket No. 204 at 15–16.

The Court finds that Ms. Ford has not presented sufficient evidence that her delayed or missed performance evaluations were adverse employment actions, as she has not established that they constituted, or resulted in, a "significant change in employment status . . . [or an action that causes] a significant change in benefits." *Stinnett*, 337 F.3d at 1217. Rather, the undisputed facts establish that Ms. Ford progressed through the ranks for Jackson, *see, e.g.*, Docket No. 204 at 6, ¶ 34, and, while she was initially awarded her a one-percent merit pay increase, after she complained about the increase and discretionary bonus, she received additional compensation. *Id.* at 10, ¶¶ 69–70. Furthermore, she ultimately agreed with the review that she did receive. *Id.*, ¶ 68.

Even if Ms. Ford could establish that the late or missed performance review or lower discretionary bonus constituted personnel actions, she has not established, supposing Jackson offered nondiscriminatory rationales for such actions, that Jackson did not believe these rationales or that the explanations behind the actions were "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." *See Young*, 468 F.3d at 1250 (internal quotation omitted). While Mr. Lane attributed Mr. Walker's treatment of Ms. Ford to her race and gender, Docket No. 210 at 12, ¶ 122, Ms. Ford has provided no facts to indicate that Mr. Lane was involved in Mr. Walker's performance review process or supervised Ms.

Ford during this time period, and Mr. Lane's hypothesis alone does not create a genuine issue as to whether any race- or gender-neutral rationale by Jackson would be unworthy of belief.

The Court next analyzes Ms. Ford's territory manipulation claim under the reassignment of duties framework. "[R]eassignment of job duties is not automatically actionable." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006). "Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* As explained above, an adverse employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007). Ms. Ford relies on *Haynes v. Level 3 Commc'ns*, 456 F.3d 1215, 1223–24 (10th Cir. 2006), for the proposition that repeated removal of accounts is an adverse action.

While the parties dispute whether Ms. Ford's territories were reassigned as she describes, and whether her earning potential actually changed, Docket No. 210 at 11, ¶¶ 110–12, even if the Court were to find that realignment of Ms. Ford's territories constituted an adverse employment action, Ms. Ford has again failed to show that Jackson's rationale for changing its territories was pretextual as required under *McDonnell Douglas*. Jackson explains that its growth in business led to a "decision to partition the New York sales territory" and the addition of "additional BDCs," Docket No.

204 at 17; however, Ms. Ford does not provide evidence that Jackson's stated business justifications are "so weak, implausible, inconsistent or incoherent that a reasonable fact finder could conclude that [they were] not an honestly held belief but rather [were] subterfuge for discrimination." *Young*, 468 F.3d at 1250 (citing *Rivera*, 365 F.3d at 924–25). The Court finds that there is no genuine dispute of material fact as to Ms. Ford's discrimination claims and that Jackson is therefore entitled to summary judgment on claims three and four in the first amended complaint in intervention.

**B. Retaliation Claims**

The Court next analyzes Ms. Ford's retaliation claims. To maintain a retaliation claim, a plaintiff is required to demonstrate that "(1) she was engaged in opposition to Title VII discrimination; (2) she was subject to an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action." *Jones*, 349 F.3d at 1269 (citing *Sanchez*, 164 F.3d at 533). To be materially adverse, an action must be sufficient to "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68 (citation omitted). This requires injury rising to a "level of seriousness." *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1087 (10th Cir. 2007). Yet what is sufficient to sustain a retaliation claim is not necessarily sufficient to sustain a discrimination claim. *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008). Rather, an employer can effectively retaliate against an employee by taking actions not directly related to the employee's employment. *Williams*, 497 F.3d at 1086–87. If a plaintiff makes this prima facie case, then "[t]he burden-shifting framework of *McDonnell Douglas* applies to Title VII

retaliation claims." *Henderson v. United Parcel Serv.*, No. 04-cv-01545-PSF-CBS, 2006 WL 1658690, at *8 (D. Colo. June 7, 2006) (citing *McGarry v. Bd. of Cnty. Comm'rs of Cnty. of Pitkin*, 175 F.3d 1193, 1201 (10th Cir. 1999)).

Ms. Ford raises multiple claims of retaliation, including that the "unsupported PIP" was retaliatory, Docket No. 210 at 24; that "Jackson actively sought to prevent her from being promoted," *id.*; that Jackson retaliated against her for her complaints by taking away her sales territories, *id.* at 8, ¶ 74; that Mr. Bossert went on a "crusade to fire Ms. Ford . . . based on her race and gender," *id.* at 25; and that she was subject to increased monitoring and a background check after she filed her EEOC charge. *Id.* at 17–18, ¶¶ 165, 172. Jackson argues that Ms. Ford's claims fail because she has not alleged that she was materially or adversely affected by any of these actions. Docket No. 204 at 16–17.

While there is no serious dispute that Ms. Ford engaged in opposition to discrimination, the parties do dispute whether Ms. Ford suffered an employment action that was "materially adverse," as required because Jackson's conduct would be dissuaded from making a charge of discrimination. *See Williams*, 513 F.3d at 1086–87.

The Court first considers Ms. Ford's PIP. Jackson insists that Ms. Ford's contention that the PIP was retaliatory must fail because Ms. Ford stated that she immediately challenged the PIP and never believed herself subjected to it. Docket No. 204 at 19. Jackson argues that Ms. Ford "*never* suffered any consequence or believed herself to be subject to the PIP, and persuaded Jackson to *immediately* investigate and then formally rescind the PIP." Docket No. 221 at 10 (citation omitted). Further, after

the PIP was rescinded, Jackson states that Mr. Stone undertook a substantial investigation into Ms. Ford's allegations and promised to review all future disciplinary actions, which, far from being a retaliatory adverse action, is actually preferential treatment. *Id.* at 20. Ms. Ford disagrees and explains that, "at Jackson, the PIP is a disciplinary action and employees on a PIP are not eligible for promotion." Docket No. 210 at 25 n.2 (citing Docket No. 210 at 12, ¶ 124 (A PIP "is a significant disciplinary action at Jackson and someone on a PIP is not eligible for promotion.")).

Whether Ms. Ford believed herself subject to the PIP, or personally found the PIP to chill her protected activity, is immaterial, as the Court's inquiry is an objective one. *See Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009). The standard is whether the employer's action would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68. The undisputed facts do not establish, contrary to Jackson's argument, that Ms. Ford never believed herself subject to the PIP. *See* Docket No. 210 at 5 ¶ 47. There is, however, a dispute whether a PIP is a serious personnel action at Jackson such that employees on PIPs cannot be promoted. *Id.* at 12, ¶ 124. Given this, the Court finds that there is a dispute as to whether the PIP was a materially adverse action at Jackson and whether imposition of a PIP would dissuade a reasonable worker from engaging in protected activity.

Ms. Ford is next required to show a causal connection between her protected activity and Jackson's imposition of the PIP. *Jones*, 349 F.3d at 1269. "The requisite causal connection may be shown by producing 'evidence of circumstances that justify

an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" *McGarry*, 175 F.3d at 1201 (quoting *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982)). The undisputed facts indicate that the PIP was imposed after Mr. Walker gave Ms. Ford a verbal warning that she was spending an insufficient amount of time on the phone and that he had received reports of rudeness by Ms. Ford and that she was arguing with co-workers. Docket No. 204 at 7, ¶¶ 39–41. But there are no facts, disputed or undisputed, to establish a causal connection between protected activity and the imposition of the PIP. Even if there were such a nexus, however, Ms. Ford has not shown that Jackson's proffered reasons behind the PIP, which were that Ms. Ford was not spending enough time working the phones and that Mr. Walker had received reports of rudeness, were pretextual.

The Court next turns to Ms. Ford's contentions that Jackson engaged in retaliation when it failed to promote her and when it realigned her sales territories. A meritorious retaliation claim may stand even if an underlying discrimination claim based on the same conduct fails. *Sanchez*, 164 F.3d at 533. Nevertheless, the Court must still apply the *McDonnell Douglas* burden-shifting framework, *see Frye v. Okla. Corp. Comm'cn*, 516 F.3d 1217, 1227 (10th Cir. 2008), and, under that framework, even if Ms. Ford is able to make a prima facie case that she was passed over for promotions in retaliation for protected activity, she must establish that Jackson's proffered explanations for choosing other candidates were pretextual. The Court has already explained that Ms. Ford has failed to prove pretext in Jackson's promotion decisions, and, therefore, the Court need not re-address Ms. Ford's retaliatory failure-to-promote claims. Similar analysis also forecloses Ms. Ford's claims that Jackson's realignment of

its sales territories was retaliatory.

The Court next considers Ms. Ford's concerns that Mr. Bossert engaged in a retaliatory "crusade" to fire her. Docket No. 210 at 25. Ms. Ford argues that managers at Jackson "went even further [than the PIP] by actively looking for reasons to terminate Ms. Ford on grounds that might not appear discriminatory" and that some managers concluded that this attempt to fire Ms. Ford "was based on her race and gender and that there was simply no other explanation for it." *Id.* The parties dispute whether Mr. Bossert ordered Mr. Blanchette to give Ms. Ford a negative performance review. *Id.* at 17, ¶ 168. The parties also dispute whether, after Ms. Ford complained of discrimination, Mr. Bossert informed human resources and other managers that Ms. Ford would use a promotion to harm Jackson. *Id.* at 16–17, ¶ 161. However, these disputes are insufficient to create a triable issue of fact for two reasons. First, the undisputed facts indicate that Mr. Blanchette refused to give Ms. Ford a negative review and that Mr. Bossert's crusade to fire her failed. Indeed, Ms. Ford found the "meets expectations" review to be fair, Docket No. 204 at 10, ¶ 68, and she submitted her letter of resignation on October 12, 2010. *Id.* at 13, ¶ 99.

Second, the Court finds that there is no genuine dispute as to whether a crusade such as Mr. Bossert's would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68. This is because the facts, disputed and undisputed, do not indicate that Ms. Ford was aware of Mr. Bossert's efforts as they were happening. Rather, even the disputed facts taken as true indicate that Mr. Bossert only spoke to other managers and human resources. *See* Docket No.

210 at 16–17, ¶¶ 161–62, 168. Because Ms. Ford has not shown that she was aware of the efforts as they were occurring, she cannot establish genuine issue that conduct like Mr. Bossert's would dissuade a reasonable employee from engaging in protected activity since a rational factfinder would not find that someone could be dissuaded by something she was not aware of. Thus, Mr. Ford has not shown a genuine dispute of material fact as to whether Mr. Bossert's efforts amounted to a materially adverse action or, therefore, whether she was retaliated against.[14]

The Court finally considers whether Jackson retaliated against Ms. Ford by subjecting her to increased scrutiny after she filed her EEOC charge, including monitoring her phone calls and running a background check on her. *Id.* at 17–18, ¶¶ 165, 172. The Court finds that Ms. Ford has not established a genuine issue that increased phone monitoring alone would dissuade a reasonable person from filing a charge with the EEOC because, as Ms. Ford explained, managers had the authority to listen to employees' work phone calls and employees were aware of such monitoring. Docket No. 210-2 at 24, 246:10–248:4.

**C. Hostile Work Environment Claims**

Ms. Ford also brings a hostile work environment claim. *See* Docket No. 51 at 4, ¶ 8, and at 11, ¶ 31. To survive summary judgment on a hostile work environment claim, "a plaintiff must show that under the totality of the circumstances (1) the

---

[14] Similar analysis applies to the allegedly retaliatory background check that Jackson ran after Ms. Ford filed her EEOC complaint. There are no allegations that Ms. Ford was contemporaneously aware of the background check, and a rational factfinder could not find that a reasonable employee in Ms. Ford's position would be dissuaded by something that the employee was unaware of.

harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment," and (2) the harassment stemmed from animus. *Chavez v. New Mexico*, 397 F.3d 826, 831–32 (10th Cir. 2005) (quoting *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) (citation omitted)). "A few isolated incidents" of enmity or "sporadic" slurs are insufficient to satisfy this burden. *Id.* at 832 (quoting *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1412–13 (10th Cir. 1987)). Instead, there must be a "steady barrage of opprobrious" comments. *Id.* (citation omitted). In determining whether conduct is sufficiently severe or pervasive, the Tenth Circuit considers: "(1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance." *Holmes v. Regents of Univ. of Colo.*, 176 F.3d 488 (Table), 1999 WL 285826, at *7 (10th Cir. May 7, 1999) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "[M]ere utterance of an . . . epithet which engenders offensive feelings in a employee, does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21 (internal quotation marks and citations omitted). Rather, in making this hostile work environment determination, a court must "consider the work atmosphere both objectively and subjectively, looking at all the circumstances from the perspective of a reasonable person in the plaintiff's position." *Herrera v. Lufkin Indus. Inc.*, 474 F.3d 675, 680 (10th Cir. 2007). That is, a hostile work environment is one that a reasonable person would find hostile or abusive.

A hostile work environment claim may be based on either severity or

pervasiveness. *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008). Indeed, those grounds "are, to a certain degree inversely related; a sufficiently severe episode may occur as rarely as once . . . , while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute." *Id.* (quoting *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002)). As the Tenth Circuit has noted, this inquiry "is particularly unsuited for summary judgment because it is quintessentially a question of fact." *Id.*

Jackson argues that Ms. Ford's claim that she experienced a sexually hostile work environment must fail. Docket No. 204 at 20. First, Ms. Ford's complaint of a lewd joke at a house party in 2008 is time-barred. *Id.* at 21. Second, her claim that Mr. Crosby made unwelcome sexual comments is insufficient to result in Title VII liability because Ms. Ford cannot show that she "subjectively perceive[d]" that the workplace was full of "discriminatory intimidation, ridicule, and insult" severe enough "to alter the conditions of [Ms. Ford's] employment and create an abusive working environment." *Id.* at 23 (quoting *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1170 (10th Cir. 2007)). Jackson notes that Ms. Ford did not complain about Mr. Crosby's comments when she drafted her comprehensive letter to human resources. *Id.*, at 23–24. Third, the obscenity written on the promotional football was a single, isolated incident, insufficient to maintain a hostile work environment claim, *id.* at 26, and it occurred after Ms. Ford resigned from Jackson and therefore cannot have altered the conditions of Ms. Ford's employment. Docket No. 221 at 15. Furthermore, Jackson insists that its "remedial action absolves it" of any liability for a hostile work environment. *Id.* at 10.

The Court finds that the 2008 vodka-bottle incident is not time-barred from consideration in the hostile work environment context for the reasons that the Court explained in its September 13, 2018 order. Docket No. 136. The Court determined that the law does not preclude stand-alone acts of discrimination, even those falling outside the 300-day window, from being considered as part of a hostile work environment. *Id.* at 18. "[W]hen analyzing a hostile work environment claim spanning longer than 300 days '[a] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice." *Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1308 (10th Cir. 2005) (quoting *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120 (2002)). This requires that there must be a sufficient relationship between the universe of conduct allegedly comprising a hostile work environment to justify the conclusion that such combined conduct constitutes one employment practice. *Id.* "[A] series of alleged events comprises the same hostile environment where 'the pre- and post-limitations period incidents involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers.'" *Id.* at 1309 (alterations omitted) (quoting *Morgan*, 536 U.S. at 120). Ms. Ford has raised a genuine dispute of fact that talk of sex on the sales desk was endemic, and male sales employees made inappropriate comments regarding female co-workers' hair, clothes, body parts, and physical appearances. Docket No. 210 at 15, ¶¶ 148–49. However, there is no indication that the vodka-bottle incident involving Mr. Poulsen in January 2008 is related to or part of any course of conduct connected with the other incidents that Ms. Ford

cites. Considering each of these factors, therefore, the Court finds that the evidence that Ms. Ford has offered of the 2008 party is not sufficient to be part of one employment practice.

As the Tenth Circuit explained in *Tademy*, 614 F.3d at 1144, a hostile work environment claim may be based on either pervasiveness or severity. The Court first considers pervasiveness. "Title VII comes into play before the harassing conduct leads to a nervous breakdown, and a discriminatorily abusive work environment, even one that does not seriously affect the employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1366 (10th Cir. 1997). The Court finds that Ms. Ford has sufficiently alleged a triable issue of fact as to whether the conduct was sufficiently pervasive to create an actionably hostile work environment, *see Gordanier v. Montezuma Water Co.*, No. 08-cv-01849-PAB-MJW, 2010 WL 1268157, at *3 (D. Colo. Mar. 30, 2010), because Ms. Ford raises a dispute about whether men on the sales desk spoke about sex "regularly" and made comments about women, which Ms. Ford was aware of. Docket No. 210 at 15, ¶¶ 148–49. A rational factfinder could conclude that Ms. Ford experienced more than "sporadic" jokes and comments. *Chavez*, 397 F.3d at 832.

The Court does not, however, find a genuine dispute as to the severity of the sexual comments that Ms. Ford experienced. For conduct to rise to the level of a hostile work environment, it must be so severe and pervasive as to unreasonably

interfere with the plaintiff's work performance. *Harris*, 510 U.S. at 23. The evidence that Ms. Ford proffers falls short. The facts indicate that, for a time, Mr. Crosby made sexual remarks and discussed pornography.[15] Docket No. 204 at 8, ¶ 54. Ms. Ford has not raised a genuine dispute, however, that she was subjected to a "physically threatening or humiliating [environment]," rather than "mere offensive utterance[s]" or shown how the sexual comments "unreasonably interfere[d] with [her] work performance." *Sprague*, 129 F.3d at 1365 (quoting Harris, 510 U.S. at 23). Mr. Crosby's comments and the behavior of the men on the sales desk were unprofessional, boorish, and unpleasant, yet the behavior falls short of the severity necessary to meet the hostile work environment test of "intimidation, ridicule, and insult" sufficient to alter the conditions of an employee's employment. *Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1175 (10th Cir. 1996) ("Casual or isolated manifestations of discriminatory conduct, such as a few sexual comments or slurs," do not equate to pervasive workplace discrimination.). Rather, Ms. Ford became a BDC, completed boot camp and finishing school, and was named to the short list for external wholesaler. Docket No. 204 at 6–7, ¶¶ 34–38. While there may be a dispute about what precisely Mr. Crosby said and did not say, Ms. Ford's claim fails because there is no dispute that his comments did not interfere with Ms. Ford's work performance. *See Harris*, 510 U.S.

---

[15] Jackson states that Mr. Crosby stopped making sexual remarks and discussing pornography after Ms. Ford complained to Ms. Amsberry around September 11, 2009. Docket No. 204 at 8, ¶ 54. Ms. Ford purports to deny this fact only in that Mr. Crosby still made "unwelcome" comments to Ms. Ford and other female co-workers. Ms. Ford has not established a genuine dispute, however, that these continued "unwelcome" comments amounted to a steady barrage of opprobrious comments as opposed to sporadic jokes and comments.

at 23.

Jackson separately contends that there is no genuine dispute of material fact that Ms. Ford did not experience a race-based hostile work environment because the incidents that she complains of fall "short of the 'steady barrage' of opprobrious racial comments" required for a hostile work environment claim. Docket No. 204 at 27 (quoting *Chavez*, 397 F.3d at 832).

While Ms. Ford complains that managers referred to Ms. Ford and another Black woman as "bitches," "divas," "resident street walkers," "Black bitches from Atlanta," and "Black Panthers," and called Black employees "pieces of shit," Docket No. 210 at 14–15, ¶¶ 140, 142–43, Ms. Ford has not alleged that she heard these comments, which makes them insufficient to establish a genuine dispute that such conduct unreasonably interfered with the Ms. Ford's work performance, *see Harris*, 510 U.S. at 23, or that the environment at Jackson was both objectively and subjectively hostile. *See Herrera*, 474 F.3d at 680.

As to the use of the word "n***er" on the sales desk, Docket No. 210 at 15, ¶ 144, while the use of that word may be, on its own, sufficient to "quickly alter the conditions of employment," *Lounds v. Linacre, Inc.*, 812 F.3d 1208, 1230 (10th Cir. 2015), the Court must consider the context and totality of the circumstances. *Lounds* involved "repeated use in the Linacre workplace of this powerfully charged racial term," *id.*, while at Jackson, the term was used once in the context of a story, according to Ms. Ford's testimony. Docket No. 210-2 at 41–42, 403:17–406:21. While the Court does not excuse or condone the use of such blatantly offensive language in a professional

environment, there is no evidence that its utterance was directed with animus to Ms. Ford or any other Black employees at Jackson, unlike in *Lounds.* The context of the use of this term does not appear to have been racial animus, so the Court will consider it "in the context of other, overtly racially-discriminatory conduct." *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999) (alterations omitted).

Moreover, because Ms. Ford had already tendered her resignation, Docket No. 204 at 14, ¶¶ 102–03, the defaced promotional football incident, while despicable, did not alter the terms or conditions of her employment such that it could create or contribute to a triable issue of Title VII liability. *Harris*, 510 U.S. at 21. The same analysis applies to the alleged statements attributed to Jackson CEO Chad Myers, which occurred "in maybe September of [20]16," Docket No. 210-7 at 8, 144:19–145:10, years after Ms. Ford left Jackson.

Thus, the Court concludes that a reasonable jury could not find that Jackson's conduct created a workplace for Ms. Ford "permeated with discriminatory intimidation, ridicule, and insult." *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 897 (10th Cir. 2017); *see also Morris v. Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012) ("[E]ven incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." (internal quotation marks omitted))). The racist and sexist comments at Jackson that Ms. Ford was subjected to appear to be "isolated incidents of racial enmity or sporadic racial slurs," insufficient to establish a triable issue of fact of a hostile work environment, *Chavez*, 397 F.3d at 832, rather than treatment that "unreasonably interfere[d] with [her] work performance." *Sprague*, 129

F.3d at 1365.

**D. Constructive Discharge Claim**

The Tenth Circuit applies an objective test to constructive discharge claims:

> Constructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign. Essentially, a plaintiff must show that she had no other choice but to quit. The conditions of employment must be objectively intolerable; the plaintiff's subjective views of the situation are irrelevant.

*Sandoval v. City of Boulder*, 388 F.3d 1312, 1325 (10th Cir. 2004) (quotations, citation, and emphasis omitted). "The plaintiff's burden in a constructive discharge case is substantial." *PVNF*, 487 F.3d at 805; *see Garrett*, 305 F.3d at 1221 ("The bar is quite high in such cases.").

Having failed to produce evidence raising a genuine issue of fact that she was subject to a hostile work environment, Mr. Ford cannot sustain the more onerous burden of proving discrimination claim premised on constructive discharge. *See Gianfrancisco v. Excelsior Youth Centers, Inc.*, No. 10-cv-00991-PAB-KMT, 2012 WL 2878007, at *10 (D. Colo. July 13, 2012). To prove such a claim, plaintiff must show both the existence of a hostile work environment and that her "working conditions [were] so intolerable that a reasonable person would have felt compelled to resign." *See Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004); *see also Tran v. Trustees of State Colleges in Colo.*, 355 F.3d 1263, 1270 (10th Cir. 2004) (noting that the constructive discharge test is objective, "under which neither the employee's subjective views of the situation, nor her employer's subjective intent with regard to discharging her, are relevant.") (citation omitted). Because Ms. Ford has failed to sustain a hostile

work environment claim in the first instance, a reasonable jury could not find, even based on Ms. Ford's disputed facts, that Jackson deliberately made or allowed plaintiff's working conditions to becomes so intolerable that she had no other choice but to quit. *See Gianfrancisco*, 2012 WL 2878007, at *10; *see also Woodward v. City of Worland*, 977 F.2d 1392, 1401 (10th Cir. 1992).

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendants' Motion for Summary Judgment [Docket No. 204] is **GRANTED**. It is further

**ORDERED** that plaintiffs' first, second, third, fourth, and fifth claims are **DISMISSED** with prejudice. It is further

**ORDERED** that Defendants' Motion to Strike Evidentiary Exhibits to and New Facts in Plaintiff's Surreply in Opposition to Defendants [sic] Motion for Summary Judgment [Docket No. 247] is **DENIED** as moot.[16] It is further

**ORDERED** that defendants' Motion to Exclude Expert Opinion of Jeffrey Nehls [Docket No. 203], defendant's Motion to Exclude Expert Opinion of Patricia Pacey [Docket No. 206], and Intervenor Plaintiff La'Tonya Ford's Motion to Exclude Certain Opinions of Dr. Ali Saad [Docket No. 208] are **DENIED** as moot. It is further

**ORDERED** that the trial preparation conference set for July 9, 2021 and the trial set for July 26, 2021 [Docket No. 263] are **VACATED**. It is further

---

[16] Jackson filed a motion to strike Ms. Ford's surreply, arguing the surreply itself raised new issues and incorporated new evidence unrelated to material in Jackson's reply. Docket No. 247. Because the Court ruled without relying on Ms. Ford's surreply, Jackson's motion to strike is moot.

**ORDERED** that this case is closed.

DATED March 11, 2021.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge