IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 16-cv-02472-PAB-SKC

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

    Plaintiff,

and

LA'TONYA FORD,

    Intervenor Plaintiff,

v.

JACKSON NATIONAL LIFE INSURANCE COMPANY, et. al.,

    Defendants.

---

# ORDER

---

This matter is before the Court on Defendants' Motion to Exclude Expert Opinion of Patricia Pacey [Docket No. 206]. Plaintiff-intervenor LaTonya Ford opposes defendants' motion. Docket No. 211.

## I. BACKGROUND

This is an employment discrimination case that was originally brought by the United States Equal Employment Opportunity Commission ("EEOC"), seven intervenor plaintiffs, including Ms. Ford, and fourteen aggrieved individuals. Docket Nos. 21, 31. The EEOC, the intervenor-plaintiffs (with the exception of Ms. Ford), and defendants, collectively referred to as "Jackson," entered into a consent decree that resolved all of the intervenor-plaintiffs' claims. Docket No. 182.

Ms. Ford alleges that, after transferring to Jackson's Denver office, she was subjected to discrimination in "almost all terms and conditions of employment and a hostile work environment, all based on her sex, race, and color." Docket No. 21 at 4, ¶ 8. She further alleges that, despite being a top performer, she was "persistently passed over for promotion to External Wholesaler, and Jackson promoted less-qualified white and/or male candidates instead." *Id.* After Ms. Ford complained to human resources and later filed a charge of discrimination and retaliation with the EEOC, she alleges that she was retaliated against. *Id.* Finally, Ms. Ford alleges that she was forced to terminate her employment with Jackson on October 12, 2010. *Id.*

Pursuant to Federal Rule of Civil Procedure 26(a)(2), Ms. Ford disclosed Dr. Patricia Pacey, a labor economist, as an expert to testify on the back and front pay losses she suffered arising from the claimed discriminatory practices of Jackson. Docket No. 206-1 at 4.

## II. LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. As the rule makes clear, while required, it is not sufficient that an expert be qualified based upon knowledge, skill, experience, training, or education to give opinions in a particular subject area. Rather, the Court must "perform[] a two-step analysis." *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006).

2

After determining whether the expert is qualified, the proffered opinions must be assessed for reliability. *See id.*; Fed. R. Evid. 702 (requiring that the testimony be "based on sufficient facts or data," be the "product of reliable principles and methods," and reflect a reliable application of "the principles and methods to the facts of the case").

In ruling on a Rule 702 motion, the district court has a "gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). To perform that function, a court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592-93). Where an expert witness relies on experience, the expert "'must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014) (quoting Fed. R. Evid. 702, advisory committee notes). When examining an expert's method, however, the inquiry should not be aimed at the "exhaustive search for cosmic understanding but for the particularized resolution of legal disputes." *Daubert*, 509 U.S. at 597. It is the specific relationship between an expert's method, the proffered conclusions, and the particular factual circumstances of the dispute that renders testimony both reliable and relevant. *Id.* at 580.

In addition to the witness having appropriate qualifications and methods, the proponent of the witness's opinions must demonstrate that the process by which the witness derived his or her opinions is reliable. *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1220 (D. Colo. 2008). Ultimately, the test requires that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

While the proponent of the challenged testimony has the burden of establishing admissibility, the proffer is tested against the standard of reliability, not correctness, *see Allstate Sweeping, LLC v. City & Cnty. of Denver*, No. 10-cv-00290-WJM-MJW, 2011 WL 2173997, at *3 (D. Colo. June 2, 2011); the proponent need only prove that "the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied." *Crabbe*, 556 F. Supp. 2d at 1221.

Assuming the standard for reliability is met, the Court must also ensure that the proffered testimony will assist the trier of fact. *See Kumho Tire*, 526 U.S. at 156; *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122–23 (10th Cir. 2006). "Relevant expert testimony must logically advance[] a material aspect of the case and be sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011) (quotations and citations omitted). In assessing whether expert testimony will assist the trier of fact, a court should also consider "whether the testimony 'is within the juror's common knowledge and

4

experience,' and 'whether it will usurp the juror's role of evaluating a witness's credibility.'" *Id.* at 476-77 (quoting *Rodriguez-Felix*, 450 F.3d at 1123).

## III. ANALYSIS

Jackson seeks to "exclude Dr. Pacey's opinions in their entirety." Docket No. 206 at 1. Jackson has two general objections to Dr. Pacey's testimony: (1) Dr. Pacey's opinions are irrelevant and "admittedly unhelpful to the trier of fact"; and (2) Dr. Pacey's opinions are unreliable. *Id.*

### A. Dr. Pacey's Initial Report

In her Initial Report, dated August 31, 2018, Dr. Pacey opines that plaintiff's economic damages totaled to $2,095,724. Docket No. 206-1 at 28. Jackson refers to this opinion as Aug. 31, 2018 Report Option 1. Docket No. 206 at 3. Dr. Pacey states that she analyzed the database provided by Jackson to identify the salaries of internal wholesaler, desk director, business development consultant, and external wholesaler by year for all Jackson sales personnel from 2007 to 2017. Docket No. 206-1 at 8. Dr. Pacey explains that this information, which includes the mean, median, 25th, and 75th percentile salaries by year and tenure, "is the basis for consideration of the probable career track, i.e., promotion and wage" for Ms. Ford. *Id.* Dr. Pacey refers to this compilation of salaries as the "Salary Matrix." *Id.* Dr. Pacey provides "economic parameters," which include "the probable pre-separation promotions and salary expectations," which are offset in her analysis by the actual or estimated wages of Ms. Ford. *Id.* Dr. Pacey calculated back pay wages "but for the disparate treatment" and based on anticipated promotions and salary increases. *Id.* To calculate front pay earnings but for disparate treatment, Dr. Pacey added a 3% average increase per year

for inflation and "consider[ed] an average blended discount rate" of 4%, resulting in "an approximate average net discount rate" of 1%.  *Id.*  Dr. Pacey states that such calculations are "conservative relative to the probable wage growth for external wholesalers at Jackson" given historical data.  *Id.*  Front pay earnings, "given the disparate treatment" of Ms. Ford, "incorporate substantially higher than average wage growth" at 8%, reflecting labor market data "which note reentry is typically at a lower wage level but generally allows for greater increased wage growth in the early years of such reemployment."  *Id.* at 9.  Dr. Pacey then discounted the front pay to present value.  *Id.*

### B.  First and Second Addenda

On November 30, 2018, Dr. Pacey submitted a First Addendum to her report, which provided an alternative estimate for Ms. Ford's damages of $3,013,455, which is applicable "should it be determined that Ms. Ford would be within the top twenty-five percent (25%) of performers in the sales force while employed with Jackson."  Docket No. 206-2 at 3.  Jackson refers to this opinion as First Supplement Option 2.  Docket No. 206 at 3.

On March 13, 2019, Dr. Pacey submitted a Second Addendum.  Docket No. 206-3.  The Second Addendum "reflect[s] the assumption that Ms. Ford will not find reemployment in the financial services industry."  *Id.* at 3.  After Ms. Ford left Jackson, she was employed by Prudential Financial; however, by January 2019, she had left that company.  Docket No. 206 at 7; Docket No. 206-3 at 3.  The calculations in the Second Addendum are applicable "should it be determined Jackson is liable for the additional losses [Ms. Ford] will now incur given her need to find new employment" since leaving

6

Prudential.  Docket No. 206-3 at 3.  Dr. Pacey provided two options in the Second Addendum.  *Id.* at 4–7.  Option 1 reflects compensation at the median salary level for years 2011 to 2017, with the exception of 2012, which reflects compensation at the 25th percentile level and estimates Ms. Ford's damages as $3,219,690.  *Id.* at 3, 8.  Jackson refers to this option as Second Supplement Option 1.  Docket No. 206 at 3.  Option 2 has more varied compensation levels, with pay at the 25th percentile for 2011, 2012, and 2014, at the median for 2013 and 2015, and at the seventy-fifth percentile for 2016 and 2017.  Docket No. 206-3 at 6.  Option 2 estimates Ms. Ford's damages at $4,137,420.  *Id.* at 7.  Jackson refers to this opinion as Second Supplement Option 2.  Docket No. 206 at 3.

### C.  Relevance and Helpfulness

The relevancy of an expert's testimony depends upon whether it can properly be applied to assist the trier of fact to decide facts in issue.  *See Daubert*, 509 U.S. at 592–93.  Such testimony is not helpful if it draws inferences or reaches conclusions within the jury's competence or within an exclusive function of the jury.  *See United States v. Call*, 129 F.3d 1402, 1406 (10th Cir. 1997).  Expert testimony is unnecessary where it addresses a question the jury is capable of assessing or determining for itself.  *See Thompson v. State Farm Fire & Cas. Co.*, 34 F.3d 932, 941 (10th Cir. 1994).

Jackson argues that Dr. Pacey's testimony is "wholly irrelevant" because, although Ms. Ford argues that she was constructively discharged on October 12, 2010, she actually resigned from Jackson and therefore is not entitled to any economic damages following her resignation.  Docket No. 206 at 2, 9.  Jackson explains that Tenth Circuit law is "clear that a plaintiff is not entitled to economic damages following

7

the date of a voluntary resignation from employment absent constructive discharge." *Id.* at 9 (citing *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 342 (10th Cir. 1986)). Therefore, Jackson argues, Ms. Ford's damages, if any, are limited to the difference between what Ms. Ford was actually paid and what she would have been paid absent discrimination until the date of her resignation. *Id.* Jackson also argues that, because the jury is capable of calculating damages on its own, Dr. Pacey's testimony is unnecessary and unhelpful. *Id.* at 14.

Ms. Ford argues that, because the constructive discharge claim is "extant, Dr. Pacey's opinion regarding damages related thereto remains relevant." Docket No. 211 at 9. Ms. Ford also argues that the question of whether Ms. Ford was constructively discharged, or voluntarily resigned, is unrelated to the reliability of Dr. Pacey's methodology. *Id.* Furthermore, Ms. Ford states that Dr. Pacey is not offering opinions on whether Ms. Ford is entitled to specific categories of damages, but rather she is providing the jury with various calculations that allow the jury to determine damages based on its liability findings. *Id.*

The Court agrees with Ms. Ford that, if the jury finds that she was constructively discharged, Dr. Pacey's opinions on the damages that Ms. Ford incurred due to constructive discharge are relevant to the claim and may be helpful to the jury in calculating damages. Moreover, while juries often calculate damages without the benefit of expert testimony, the Court finds that Dr. Pacey's testimony would help the jury conduct its calculations. Dr. Pacey's methodology factors in inflation, career trajectory, ancillary benefits, and other items to determine the extent of Ms. Ford's damages, which are not matters within the ken of an average juror. *See Zimmerman v.*

*Univ. of Utah*, 2018 WL 10152217, at *3 (D. Utah. Aug. 8, 2018) ("[A]n award of front pay cannot be based solely on lay testimony regarding salary, benefits, and an employee's intent regarding her employment duration" because calculating "front pay requires a prediction of future events involving 'many complicated and interlocking factors.'" (quoting *Mason v. Okla. Turnpike Auth.*, 115 F.3d 1442, 1458 (10th Cir. 1997), *overruled on other grounds, TW Telecom Holdings Inc. v. Carolina Internet Ltd.*, 661 F.3d 495, 496 (10th Cir. 2011)).

However, the Court finds that Dr. Pacey's opinions for the years after Ms. Ford left Prudential, as noted in Dr. Pacey's Second Addendum, would not be helpful to the jury. In her deposition, Dr. Pacey acknowledged that she issued the Second Addendum based on Ms. Ford's conversations with Dr. Pacey, wherein Ms. Ford claimed that Jackson improperly "blackball[ed]" her and caused Prudential to terminate her. Docket No. 206-4 at 15, 158:7-160:4. As a result, Ms. Ford believes that Jackson is responsible for her inability to find employment in the industry. *Id.* Dr. Pacey testified that "the damages identified in the second addendum from Ms. Ford are based on the predicate that but for the actions of Jackson and/or Prudential, she's no longer in the industry and doesn't believe she can get back in it." *Id.*, 159:19-24. Dr. Pacey acknowledged that Ms. Ford's "damages would be substantially larger if it's determined that Jackson and/or Prudential were the cause behind it, that loss." *Id.* at 16, 163:3-9. The claims in this case have been brought against defendants for discrimination and retaliation that occurred from January 2008 to the date of Ms. Ford's constructive discharge. *See* Docket No. 283-1 at 44; Docket No. 51 at 4, ¶ 8. Ms. Ford has made no claims against Jackson for retaliation while she worked at Prudential or for tortious

interference with her employment at Prudential. Those issues are not part of this case and any testimony or assumptions about them from Dr. Pacey are irrelevant and would be prejudicial to Jackson. Ms. Ford cannot effectively amend the complaint to add a cause of action through her expert's testimony.

The Court finds that Dr. Pacey's methodology for her damages calculations, other than those in the Second Addendum, are both relevant and helpful to the jury.

### D.  Reliability

Jackson makes three arguments about the reliability of Dr. Pacey's opinions. First, Jackson seeks to exclude the Initial Report because Dr. Pacey "assumed [Ms.] Ford would be promoted to the [external wholesaler] position in the third quarter of 2010," but the assumption that Ms. Ford would be promoted, and when she would have been promoted, was "based entirely on [Ms.] Ford's own belief." Docket No. 206 at 5–6. Second, Jackson argues that the figures taken from the Salary Matrix are unreliable because they do not take into account variables that would have affected Ms. Ford's compensation. *Id.* at 11. Third, Jackson argues that Dr. Pacey provided no explanation for choosing various rates of pay for Ms. Ford in the Initial Report, the First Addendum, or the Second Addendum. Jackson argues that in her initial report Dr. Pacey assigned Ms. Ford, for 2011 to 2017 (with the exception of 2012), a "median rate of compensation for Jackson's [external wholesaler] company-wide with similar tenure," and, for 2012, Dr. Pacey assigned Ms. Ford compensation at the 25th percentile. *Id.* (citing Docket No. 206-1 at 25). In the First Addendum, Dr. Pacey recalculated Ms. Ford's compensation at the 75th percentile for some years. *Id.* (citing Docket No. 206-2 at 6). But, according to Jackson, Dr. Pacey provided no methodology for her conclusions that

10

Ms. Ford would have been compensated at a particular rate in a particular year. *Id.* at 11–12. Rather, according to Jackson, Dr. Pacey increased the damages calculation in the First Addendum based on Ms. Ford's "subjective insistence that she would have been a higher-than-median performer," ignoring variables that impact external wholesaler pay, like compensation/commission, bonuses, channel, territory, and sales ability. *Id.* at 12. In the Second Addendum, Dr. Pacey increased her calculation again based on the "unsupported conjecture that Jackson was the cause of [Ms.] Ford's termination from Prudential[,] . . . despite being informed by [Ms.] Ford that her termination from Prudential related to below expectations performance." *Id.* at 13.

Ms. Ford counters that Jackson's arguments fail because experts' reports are tested against the standard of reliability, not correctness. Docket No. 211 at 4 (citing *Independence Inst. v. Gessler*, No. 10-cv-00609-PAB-MEH, 2012 WL 959397, at *2 (D. Colo. Mar. 21, 2012)). In addition, Ms. Ford argues that Dr. Pacey based her opinions on statistical data from Jackson, economic data, and her unchallenged expertise as a labor economist. *Id.* Dr. Pacey analyzed the average promotion time for non-protected employees at Jackson and then applied that timeline to Ms. Ford, and she explained that, if the jury determines that a different promotion date is appropriate, the damages calculation can be adjusted based on the jury's fact finding. *Id.* at 4–5. Ms. Ford contends that Dr. Pacey did not base her report on Ms. Ford's "pushback" or subjected beliefs. *Id.* at 4. As to Jackson's arguments that Dr. Pacey did not properly consider factors like sales territories, Ms. Ford argues that Jackson has stated that the sales territories are adjusted to be "equally the same." *Id.* at 5 (citing Docket No. 204 at 11, ¶ 76).

While the date that Dr. Pacey chose for Ms. Ford's promotion to external wholesaler is somewhat arbitrary, it was based on employee averages and was picked "for simplicity." Docket No. 206-4 at 7, 49:12–23. And while Ms. Ford's belief that her promotion should have occurred "three months earlier" than her peers may have had a role in Dr. Pacey's selection of the promotion date, Dr. Pacey explains that "there[ is] no exact answer." *Id.*, 50:01–52:12. Ms. Ford argues that, if the jury determines that Dr. Pacey chose the wrong date, it may modify the calculations accordingly. Docket No. 211 at 4–5.

The Court agrees with Ms. Ford. Dr. Pacey is not qualified to predict when Ms. Ford may or may not have been promoted but for discrimination the jury may find. Rather, as Dr. Pacey noted, she assumed the promotion date for purposes of her calculations, and she explained how the jury can modify the damages based on its finding that Ms. Ford should have been promoted on a different date than the one Dr. Pacey chose. *Id.* at 2–3. While Jackson argues that Dr. Pacey's methodology was nothing more than her "personal judgment," Docket No. 219 at 5, Jackson does not challenge Dr. Pacey's qualifications as a labor economist. Under the circumstances, Dr. Pacey's assumptions do not render her opinions unreliable given that Dr. Pacey disclaims making any judgments about whether the assumptions are true.

While Dr. Pacey provided little justification for why she first placed Ms. Ford at the median for earnings in some years and at the 25th and 75th percentiles for other years, her doing so does not lead to exclusion because, as with the selection of the promotion date, her assumptions do not render the calculations that result from the assumptions clearly unreliable. Furthermore, Dr. Pacey provides alternative

12

calculations, at different percentiles, that the jury could employ if it were to find Ms. Ford's performance differed from Dr. Pacey's assumptions.

Finally, Jackson claims that Dr. Pacey failed to analyze several variables that determine the compensation of an external wholesaler, namely, base salary, special compensation (commission), and a year-end bonus. Docket No. 206 at 12. However, Jackson does not explain what the magnitude of any such failure would be on Dr. Pacey's calculations. The Rule 30(b)(6) testimony that Jackson cites does not support the argument that these variables would result in a material difference. *See* Docket No. 206-8. Moreover, Jackson cites no support for the proposition that Dr. Pacey's failure to take these variables into account are contrary to Dr. Pacey's methodology or fall below the standards of her profession. Therefore, the Court finds that Dr. Pacey's failure to account for these variables does not render her opinions so unreliable as to justify their exclusion.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendants' Motion to Exclude Expert Opinion of Patricia Pacey [Docket No. 206] is **DENIED**.

DATED March 31, 2022.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge

13